Abruzzi v Maller (2023 NY Slip Op 05704)

Abruzzi v Maller

2023 NY Slip Op 05704

Decided on November 15, 2023

Appellate Division, Second Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on November 15, 2023
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

MARK C. DILLON, J.P.
VALERIE BRATHWAITE NELSON
ANGELA G. IANNACCI
WILLIAM G. FORD
HELEN VOUTSINAS, JJ.

2015-12248 
2016-01764
 (Index No. 183/13)

[*1]Susan Abruzzi, as executor of the estate of Barbara Petillo, appellant, 
v
Paul Maller, etc., et al., defendants, Alexander Hindenburg, etc., et al., respondents.

Sullivan Papain Block McGrath Coffinas & Cannavo P.C., New York, NY (Brian J. Shoot and Albert B. Aquila of counsel), for appellant.
Kerley, Walsh, Matera & Cinquemani, P.C., Seaford, NY (Rosemary Cinquemani and Lauren Bristol of counsel), for respondents.

DECISION & ORDER
In an action to recover damages for medical malpractice, the plaintiff appeals from (1) an order of the Supreme Court, Nassau County (Margaret C. Reilly, J.), entered November 6, 2015, and (2) a judgment of the same court dated December 8, 2015. The order, insofar as appealed from, granted the motion of the defendants Alexander Hindenburg and Winthrop Oncology Hematology Associates, P.C., for summary judgment dismissing the complaint insofar as asserted against them. The judgment, upon the order, is in favor of the defendants Alexander Hindenburg and Winthrop Oncology Hematology Associates, P.C., and against the plaintiff dismissing the complaint insofar as asserted against those defendants.
ORDERED that the appeal from the order is dismissed; and it is further,
ORDERED that the judgment is affirmed; and it is further,
ORDERED that one bill of costs is awarded to the defendants Alexander Hindenburg and Winthrop Oncology Hematology Associates, P.C.
The appeal from the order must be dismissed because the right of direct appeal therefrom terminated with the entry of the judgment in the action (see Matter of Aho, 39 NY2d 241, 248). The issues raised on the appeal from the order are brought up for review and have been considered on the appeal from the judgment (see CPLR 5501[a][1]).
In May 2011, Barbara Petillo sought treatment from the defendant Paul Maller, her primary care doctor, for an unexplained fever. After treatment with oral antibiotics failed, Maller ordered a CT scan, among other tests. Based on Petillo's history of lymphoma and the imaging results, which showed suspicious masses in her abdomen and lung, Maller referred Petillo to the defendant Alexander Hindenburg, a medical oncologist for the defendant Winthrop Oncology Hematology Associates, P.C. (hereinafter Winthrop), to assess her for a possible recurrence of [*2]lymphoma. Maller also referred Petillo to specialists in rheumatology and infectious disease. Petillo never consulted with an infectious disease specialist. Petillo consulted with a rheumatologist, the defendant Howard Futerman, on June 30, 2011, and July 14, 2011. Futerman ruled out any rheumatological disorder. Maller testified at his deposition that cancer was the next cause to rule out, and after that, infectious disease. Petillo testified at her deposition that it was her understanding that Maller referred her to Hindenburg to rule out lymphoma or any other cancer.
On July 19, 2011, Hindenburg examined Petillo and thereafter ordered a series of additional imaging tests and biopsies. Hindenburg saw Petillo three times—on July 19, 2011, September 6, 2011, and November 8, 2011—and after each visit, he issued reports that were sent to Maller. The July 19, 2011 report begins with the notation: "Patient is referred for an abdominal mass with bilateral pulmonary modules." The September 6, 2011 report begins with the notation: "The patient returns here for a follow-up visit for her abdominal mass as well as lung nodules." The November 8, 2011 report begins with the notation: "The patient returns here for a follow-up visit for her abnormal PET/CT scan suggestive of lymphadenopathy and also mesenteric mass." Hindenburg was unable to definitively diagnose or rule out a malignancy, and on November 8, 2011, he referred Petillo to her pulmonologist and to an infectious disease specialist. Petillo did not consult with an infectious disease specialist before she was hospitalized on December 5, 2011. Upon her admission to the hospital, blood cultures showed that she had a bacterial infection that developed into endocarditis, an infection affecting the heart. Thereafter, she suffered a stroke, which allegedly was endocarditis-related.
In September 2012, Petillo commenced this action to recover damages for medical malpractice against Hindenburg and Winthrop (hereinafter together the Hindenburg defendants), among others. Petillo alleged that Hindenburg deviated from the standard of care, inter alia, by failing to perform or order a blood culture and certain other blood tests. The Hindenburg defendants moved for summary judgment dismissing the complaint insofar as asserted against them. In an order entered November 6, 2015, the Supreme Court, inter alia, granted the motion. On December 8, 2015, a judgment was issued, upon the order, dismissing the complaint insofar as asserted against the Hindenburg defendants. Petillo appealed. During the pendency of the appeal, Petillo died, and Susan Abruzzi, as executor of Petillo's estate, was substituted for Petillo.
"In order to establish the liability of a physician for medical malpractice, a plaintiff must prove that the physician deviated or departed from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries" (Stukas v Streiter, 83 AD3d 18, 23; see Paglinawan v Ing-Yann Jeng, 211 AD3d 743). "However, in order to reach any discussion[s] about deviation from accepted medical practice, it is necessary first to establish the existence of a duty" (Cooper v City of New York, 200 AD3d 849, 851 [internal quotation marks omitted]). "'Although physicians owe a general duty of care to their patients, that duty may be limited to those medical functions undertaken by the physician and relied on by the patient'" (id. at 851, quoting Meade v Yland, 140 AD3d 931, 933 [internal quotation marks omitted]). "The existence and scope of a physician's duty of care is a question of law to be determined by the court" (Cooper v City of New York, 200 AD3d at 851).
Here, the Hindenburg defendants established their prima facie entitlement to judgment as a matter of law by submitting, inter alia, certain deposition testimony, medical records, and an affirmation from their expert, Ivan K. Rothman, a physician who was board certified, among other things, in medical oncology. The deposition testimony of both Petillo and Maller demonstrated that Petillo was referred to Hindenburg in his role as an oncologist and for the purpose of ruling out lymphoma or any other cancer. Rothman opined that it was appropriate for Hindenburg "to work up [Petillo] for a possible malignancy," that the steps Hindenburg took to do so were proper, and that Hindenburg appropriately evaluated and treated Petillo for the condition he was asked to evaluate within his specialty and area of expertise, oncology. Rothman opined that Hindenburg did not depart from accepted medical practice in failing to diagnose endocarditis. Rothman addressed and rebutted the specific allegations of malpractice set forth in the complaint and bills of particulars (see Elstein v Hammer, 192 AD3d 1075, 1077; Sheppard v Brookhaven Mem. Hosp. Med. Ctr., 171 AD3d 1234, 1235). He explained how and why Hindenburg did not depart from good and accepted practice. [*3]Moreover, the evidence submitted in support of the motion established that Hindenburg's duty was limited to that of a medical oncologist and did not extend to the diagnosis and treatment of infectious disease. No evidence was submitted that Hindenburg assumed a duty of care to diagnose and treat an infectious disease or that Petillo relied on him for such care (see Elstein v Hammer, 192 AD3d at 1078; Matthis v Hall, 173 AD3d 1162, 1164). The Hindenburg defendants demonstrated that Hindenburg's duty of care did not extend to the departures alleged in the complaint (see Cooper v City of New York, 200 AD3d at 851; Elstein v Hammer, 192 AD3d at 1078; Chin v Long Is. Coll. Hosp., 119 AD3d 833, 834).
In opposition, Petillo failed to raise a triable issue of fact. Petillo submitted, inter alia, an affirmation from a physician who was board certified in internal medicine and infectious disease, and an affirmation from a surgical oncologist. "'While it is true that a medical expert need not be a specialist in a particular field in order to testify regarding accepted practices in that field . . . the witness nonetheless should be possessed of the requisite skill, training, education, knowledge or experience from which it can be assumed that the opinion rendered is reliable'" (Behar v Coren, 21 AD3d 1045, 1046-1047, quoting Postlethwaite v United Health Servs. Hosps., 5 AD3d 892, 895; see Tsimbler v Fell, 123 AD3d 1009, 1009-1010; Shectman v Wilson, 68 AD3d 848, 849). Thus, where a physician opines outside his or her area of specialization, a foundation must be laid tending to support the reliability of the opinion rendered (see Tsimbler v Fell, 123 AD3d at 1009; Shectman v Wilson, 68 AD3d at 850; Geffner v North Shore Univ. Hosp., 57 AD3d 839; Bjorke v Rubenstein, 53 AD3d 519, 520; Glazer v Choong-Hee Lee, 51 AD3d 970, 971; Mustello v Berg, 44 AD3d 1018, 1019; Behar v Coren, 21 AD3d at 1046-1047). Moreover, "[i]n order not to be considered speculative or conclusory, expert opinions in opposition should address specific assertions made by the movant's experts, setting forth an explanation of the reasoning and relying on specifically cited evidence in the record" (Tsitrin v New York Community Hosp., 154 AD3d 994, 996 [internal quotation marks omitted]; see Bum Yong Kim v North Shore Long Is. Jewish Health Sys., Inc., 202 AD3d 653, 655).
Here, Petillo's internal medicine and infectious disease expert failed to lay the requisite foundation to render an opinion on Hindenburg's actions as a medical oncologist (see DiLorenzo v Zaso, 148 AD3d 1111, 1115; Behar v Cohen, 21 AD3d at 1047). The expert did not claim to have any skill, training, education, knowledge, or experience in the field of medical oncology. While the expert gave an opinion that Hindenburg departed from the standards of care applicable to internal medicine, Petillo was not referred to Hindenburg as an internist and Hindenburg did not treat Petillo as an internist, rendering the standard of care for an internist inapplicable.
Petillo's surgical oncologist expert also failed to lay the requisite foundation to render an opinion on Hindenburg's actions as a medical oncologist. This expert, a board-certified surgeon who practices in the field of surgical oncology, a specialty distinct from medical oncology, failed to establish that he had the skill, training, education, knowledge, or experience in the field of medical oncology sufficient to provide a foundation to opine on the clinical standard of care and departures of a medical oncologist. He did not claim that he has ever provided an oncology diagnosis and treatment to any patient. The expert did not provide any credentials indicating any training or experience in the setting of seeing, evaluating, and treating patients in an oncology office, and failed to provide any foundation for any expertise in that capacity. The expert failed to set forth any qualifications to establish his training or specific knowledge as to the standards of care involved in the medical oncology treatment of a patient, such as Petillo. Neither the expert's affirmation nor his curriculum vitae set forth how he was, or became, familiar with the applicable clinical standards of medical oncology care. The expert merely stated, in conclusory fashion, that as a surgical oncologist, he has "worked in conjunction with medical oncologists in connection with the treatment of cancer patients" without any further explanation. Notably, the expert's trial testimony in several other cases includes testimony that he practices exclusively as a surgeon; that as a surgical oncologist, he operates and removes tumors and recurrences as they occur; and that he deals only with patients who have already been diagnosed with cancer. The expert also testified, on several occasions, that there are three disciplines in cancer treatment, and addressed clear distinctions amongst those specialties: surgical oncologists, who deal with the surgical aspects of cancer; radiation oncologists or therapists, [*4]who deliver radiation treatment for cancer patients; and medical oncologists, who generally prescribe chemotherapy and treat people with chemotherapy. The expert also gave an opinion regarding infection and endocarditis. The expert stated, in a conclusory fashion, that he is "fully aware of the standard of care for testing patients with fevers of unknown origin or suspected infections," without explanation of how he became familiar with this specialized area of practice.
Furthermore, we do not agree with our dissenting colleagues' assertion that the surgical oncologist expert's particular membership and affiliation with specific surgical, medical, and oncology societies "bolster[ed] th[e] foundation" laid by the expert, since we find that the expert never laid a proper foundation, in the first place, to render an opinion on Hindenburg's actions as a medical oncologist.
Cerrone v North Shore-Long Is. Jewish Health Sys., Inc. (197 AD3d 449), cited by our dissenting colleagues, is inapposite to this case. In Cerrone, the plaintiff alleged that the defendants were negligent in the care rendered to him during his hospitalization, and as a result, he developed ulcers, lesions, and bed sores throughout his body. This Court determined that the plaintiff's expert, a thoracic surgeon and Medical Director of the University of Vermont Health Network-CVPH Wound Center, established that his qualifications were sufficient to render an opinion as to the propriety of the wound care provided to the plaintiff where the expert had averred that he had practiced surgery and wound care for approximately 30 years and that by virtue of his training and experience, he was fully familiar with the standards of accepted practice in the field of wound care and with the responsibilities of hospital staff and physicians in the prevention and treatment of pressure/decubitis ulcers, as they existed in 2008 (see id. at 451-452). We noted that although the expert's curriculum vitae made no specific reference to wound care until 2013, when he was appointed Medical Director of the University of Vermont Health Network-CVPH Wound Center, this did not contradict his affirmation with regard to his experience or familiarity with the standard of care in 2008 (see id. at 452). Thus, we determined that the plaintiff's expert's affirmation sufficiently averred that he had practiced surgery and wound care for approximately 30 years (see id.). Unlike in Cerrone, however, Petillo's expert in this case did not aver that he had ever practiced in the field of medical oncology.
In addition, the opinions of Petillo's experts failed to address specific assertions made by Rothman, the Hindenburg defendants' expert, and the evidence relied upon by Rothman in rendering his opinion. Moreover, portions of the opinions of Petillo's experts were contradicted by the record. For example, Petillo's experts erroneously described the two biopsies performed on Petillo as negative, rather than nondiagnostic, which is indicated in the record. The experts ignored and failed to address the opinion set forth by Rothman, and the underlying facts set forth in the record, regarding the biopsies that were relied upon by Hindenburg in his evaluation of Petillo for a suspected recurrence of lymphoma or other malignancies. Rothman set forth in detail how the first biopsy performed on July 21, 2011, yielded a nondiagnostic specimen and more tissue was needed to be obtained for the pathologist. With respect to the second biopsy, performed on August 12, 2011, Rothman stated that although the pathologist reported the specimen as negative for malignant cells, the pathologist also noted the specimen to have scanty material, and Hindenburg considered the second biopsy to be nondiagnostic as well. Rothman discussed how Stavros Stavropoulos, the gastroenterologist who performed the biopsies, had suggested, after the second biopsy, that an open procedure be performed in order to further investigate. This was consistent with Petillo's and Hindenburg's deposition testimony. However, Petillo's experts wholly ignored this part of Rothman's affirmation, as well as the underlying medical records regarding the biopsies. Petillo's experts' discussion of the two biopsies was limited to their each stating that "Petillo next saw Dr. Hindenburg on September 6, 2011 after she underwent 2 biopsies that were negative for malignancy."
Petillo's experts also both stated in their respective affirmations that "Hindenburg could not find any clinical signs of lymphoma. The only potential evidence of lymphoma was the mass found on the CT scan." This also is not accurate. Hindenburg's July 19, 2011 report states that physical examination revealed "[p]alpable lymphadenopathy" and "a small palpable questionable nodule," and Rothman noted in his affirmation that Hindenburg "performed a physical examination [*5]and noted a palpable questionable nodule in the left lower quadrant."
Accordingly, the opinions of Petillo's experts were of no probative value and were insufficient to defeat the Hindenburg defendants' prima facie showing (see Bum Yong Kim v North Shore Long Is. Jewish Health Sys., Inc., 202 AD3d at 656; Attia v Klebanov, 192 AD3d 650, 652; Elstein v Hammer, 192 AD3d at 1079; Korszun v Winthrop Univ. Hosp., 172 AD3d 1343, 1345; Geffner v North Shore Univ. Hosp., 57 AD3d at 842).
Additionally, Abruzzi and our dissenting colleagues erroneously rely upon an excerpt of Maller's deposition testimony where he stated that Hindenburg "took over the case." However, a review of Maller's deposition testimony in its entirety demonstrates that Maller was only referring, in this isolated quote, to addressing the suspicious masses in the abdominal and pulmonary areas that were seen on the July 1, 2011 abdominal CT scan and chest X-ray—Hindenburg "took over the case" insofar as investigating the abdominal and lung findings. Maller testified that by June 21, 2011, he began to be concerned that the most likely cause of Petillo's persistent fevers might be a recurrence of abdominal lymphoma. On June 24, 2011, Maller decided that it was time to take further action and ordered a chest X-ray and an abdominal CT scan, and also told Petillo that she had to see three different specialists: a rheumatologist (Futerman), an infectious disease doctor, and an oncologist (Hindenburg). There was no particular order, "whichever came first." The chest X-ray and abdominal CT scan were performed on July 1, 2011. Maller testified that the studies showed a right middle lobe mass and a possible additional lower lobe density, and a mass in the upper abdomen encasing the proximal superior mesenteric artery. Maller testified that Hindenburg would address the findings of the July 1, 2011 chest X-ray and abdominal CT scan. Read in context, it is clear that Maller's statement that "Hindenburg sort of took over the case" was in reference to the results of the July 1, 2011 diagnostic studies and pertained to Hindenburg being the doctor who would address the abdominal mass as well as the pulmonary nodes that appeared on those studies. In addition, Maller was testifying, at this point, about his discussions with Petillo on July 12, 2011, in relation to his review of the July 1, 2011 CT scan and chest X-ray and the masses shown on those studies. When asked whether he had "refer[red] the patient to people after this study," he answered, "Well, Dr. Hindenburg sort of took over the case." However, Hindenburg had not even seen Petillo yet. Petillo was seen by Hindenburg for the first time on July 19, 2011.
It is also evident from Maller's testimony that his referral of Petillo to three different specialists was limited, in each instance, to those physicians' respective specialties. When asked, "Was Dr. Futerman [the rheumatologist] as far as you're concerned treating anything besides rheumatology or rheumatological issues?" Maller testified that "[Futerman] wasn't treating  he was just  he was giving  shedding light, giving an opinion. He was not treating anything per se." When asked if Futerman's report "shed light" on what could be causing the fevers, Maller testified, "Yeah, it did. In his impression he said, [reading] Essentially benign examination without any strong clinical or historical suggestion of a systemic rheumatologic or connective tissue disease. I am concerned that her FUO [fever of unknown origin] is neoplastic rather than infectious in origin." Petillo had seen Futerman on June 30, 2011, and July 14, 2011, and Futerman ruled out a rheumatological disorder and suspected that cancer was the cause of Petillo's ongoing fevers. Maller explained that based on Futerman's examination of Petillo, a rheumatological problem was ruled out. Maller was then asked what other causes were left to rule out, and he answered that cancer "was the next thing to rule out" and "[a]fter that it would be whatever the infectious disease specialist suggested." Maller testified that based on Petillo's history of lymphoma and the imaging results from the July 1, 2011 diagnostic tests, he referred Petillo to Hindenburg to rule out a recurrence of lymphoma. Maller was questioned about Hindenburg's initial report to him, dated July 19, 2011, and was asked if he was "thinking cancer at the time," and Maller stated, "Yeah. At this time yes." He was then asked if he had ruled out infectious disease "at this time." Maller answered, "That's what I wanted the infectious disease doctor to do." Maller told Petillo that "the infectious disease doctor might perform further testing on her to determine any other causes for the fever, such as any kind of bacteria or et cetera, that she had to see this doctor." Finally, Petillo herself testified that it was her understanding that Maller referred her to Hindenburg for him to rule out lymphoma or any other cancer.
In sum, we conclude that the Hindenburg defendants demonstrated through their submissions that Hindenburg's role was limited to evaluating whether there was a recurrence of lymphoma or any other cancer that needed to be addressed, that he did not depart from good and accepted practice in that regard, and that his duty of care as a medical oncologist did not extend to the alleged departures in failing to diagnose endocarditis. In opposition, Petillo failed to raise a triable issue of fact.
Accordingly, the Supreme Court properly granted the Hindenburg defendants' motion for summary judgment dismissing the complaint insofar as asserted against them.
Abruzzi's remaining contentions have been rendered academic in light of our determination.
DILLON, J.P., BRATHWAITE NELSON and VOUTSINAS, JJ., concur.
IANNACCI, J., concurs in part and dissents in part, and votes to dismiss the appeal from the order and to reverse the judgment, on the law, deny the motion of the defendants Alexander Hindenburg and Winthrop Oncology Hematology Associates, P.C., for summary judgment dismissing the complaint insofar as asserted against them, reinstate the complaint insofar as asserted against those defendants, and modify the order accordingly, with the following memorandum, in which FORD, J., concurs:
My colleagues in the majority conclude that the medical malpractice cause of action asserted against the defendants Winthrop Oncology Hematology Associates, P.C., and Alexander Hindenburg (hereinafter together the Hindenburg defendants), a doctor board certified in oncology, hematology, and internal medicine, to whom the plaintiff's decedent (hereinafter the decedent) was referred when she was experiencing unexplained fevers, can be decided as a matter of law on the Hindenburg defendants' motion for summary judgment. In contrast, I find that the conflicting expert opinions submitted by the decedent and the Hindenburg defendants, particularly when viewed, as they must be, in the light most favorable to the decedent (see Vega v Restani Constr. Corp., 18 NY3d 499, 503), raised questions of fact and credibility which can only properly be determined by a trier of fact. I therefore dissent in part, and would deny the Hindenburg defendants' motion for summary judgment.
In 2011, the decedent, then 64 years old, saw her internal medicine doctor, Paul Maller, for recurring fevers and was prescribed several courses of antibiotics. The fevers resolved initially with the antibiotics but would then recur. Due to the decedent's history of lymphoma in the 1990s, which had been successfully treated with chemotherapy, and the results of an abdominal CT scan showing the presence of a mass, Maller referred the decedent to Hindenburg. Maller did not see the decedent again after this referral, and he testified at his deposition that, at that point, Hindenburg "took over the case."
Hindenburg's initial note on July 19, 2011, indicated that the decedent had been experiencing fevers for two to three months which initially resolved with antibiotics and then recurred. According to Hindenburg's deposition testimony, the fevers could have been caused by cancer or an "obscure infection." Suspecting a recurrence of lymphoma or other type of cancer, Hindenburg referred the decedent for a biopsy and also ordered certain blood tests, but did not order a blood culture to test for infection. Hindenburg acknowledged that while patients referred to him usually have a diagnosis of cancer, the decedent did not have a diagnosis. However, Hindenburg testified, "[i]t would not be [his] jurisdiction to address the fevers." The initial biopsy and radiological testing were not definitive, but a repeat scan later revealed that the abdominal mass could no longer be seen. Hindenburg noted that the decedent was still experiencing fevers and that there were certain lesions in her lungs (which a pulmonologist whom the decedent next consulted believed were more likely to be infectious than secondary to lymphoma). Hindenburg wrote in his last note of November 8, 2011, that the etiology of the decedent's fevers "remain[ed] puzzling."
On December 5, 2011, the decedent was admitted to a hospital where a blood culture was performed which revealed bacteria in her blood. The decedent was diagnosed with endocarditis, an infection of the heart "which generally occurs when bacteria from another part of the body spreads, through the blood stream" to the heart. Five days after her diagnosis, the decedent suffered a stroke.
The decedent subsequently commenced this action against, among others, the Hindenburg defendants to recover damages for medical malpractice. The decedent principally alleged, as against the Hindenburg defendants, that Hindenburg negligently failed to perform a blood culture, leading to a delay in diagnosis of endocarditis and stroke. The Hindenburg defendants moved for summary judgment dismissing the complaint insofar as asserted against them. The Supreme Court granted the motion, and a judgment was entered in favor of the Hindenburg defendants dismissing the complaint insofar as asserted against them.
On a motion for summary judgment dismissing a cause of action alleging medical malpractice, the defendant bears the initial burden of establishing that there was no departure from good and accepted medical practice or that any alleged departure did not proximately cause the plaintiff's injuries (see Wiater v Lewis, 197 AD3d 782, 783). If the defendant makes such a showing, the burden then shifts to the plaintiff to raise a triable issue of fact, but only as to those elements on which the defendant met its prima facie burden of proof (see Alvarez v Prospect Hosp., 68 NY2d 320, 324; Stukas v Streiter, 83 AD3d 18, 30).
I agree with my colleagues in the majority that the Hindenburg defendants demonstrated their prima facie entitlement to judgment as a matter of law dismissing the complaint insofar as asserted against them. They submitted an affirmation from an expert, Ivan K. Rothman, M.D., who opined that given the decedent's history and symptoms, it was appropriate for Hindenburg "to work up the [decedent] for a possible malignancy," and that the steps he took to do so were proper. Further, Rothman concluded that "[t]he standard of care for an oncologist to whom a patient has been referred to rule in or rule out a malignancy, does not require a blood culture where the patient's presentation was consistent with a malignancy, and was not consistent with an infectious process." Rothman indicated that the "fever of unknown origin, . . . in light of [the decedent's] radiologic findings, her history of lymphoma, and no other symptoms, was consistent with a cancerous process." In contrast, Rothman opined, the decedent's symptoms were not consistent with endocarditis.
Significantly, what Rothman did not state was that if the decedent's symptoms were inconsistent with a cancerous process and consistent with endocarditis, Hindenburg's treatment would still have met the standard of care despite his failure to perform a blood culture. On this point, the decedent raised a triable issue of fact. The decedent presented an expert affirmation from a doctor who was board certified in internal medicine and infectious disease, and an affirmation from a surgical oncologist. Contrary to Rothman's conclusion that the decedent's symptoms were consistent with cancer and not with endocarditis, the decedent's experts opined that the decedent's presentation was more consistent with endocarditis than with lymphoma. Among other things, they explained that a history of fevers which respond temporarily to antibiotics is strongly indicative of a bacterial infection, not cancer or lymphoma, which cause fevers that do not respond to antibiotics. The experts further opined that accepted medical practices required Hindenburg to order a blood culture "in connection with a patient whose fevers of unknown origin [were] part of what [he was] investigating," especially where he was ordering other blood tests.
The decedent's oncology expert added that if the decedent had been experiencing recurrent lymphoma, as Hindenburg initially suspected, that condition would have weakened her immune system and made her more susceptible to bacterial infections. The oncologist opined that "infections are something oncologists are aware of and deal with" in light of such typical immunocompromise, and that it is "not uncommon for medical oncologists to order blood cultures when a patient is suspected of having an infection." Indeed, the oncologist explained, not only was knowing whether the decedent "had a superimposed infection in the setting of a potentially cancerous mass" important, but also "knowing that a fever of unknown origin may NOT be related [*6]to cancer [was] an important factor in the workup."
Thus, the decedent presented expert medical opinion contradicting the opinion of the Hindenburg defendants' expert that the "standard of care" did not require a blood culture because "the patient's presentation was consistent with a malignancy, and was not consistent with an infectious process." Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions, as such conflicting opinions raise credibility questions that must be resolved by a factfinder (see Hall v Bolognese, 210 AD3d 958, 963).
To the extent that the Hindenburg defendants' expert opined that the taking of a blood culture went beyond the consultation Hindenburg had been engaged to perform and the scope of the treatment he reasonably could be expected to provide to the decedent, the decedent's experts raised triable issues of fact in that regard as well. "Although physicians owe a general duty of care to their patients, that duty may be limited to those medical functions undertaken by the physician and relied upon by the patient" (Romanelli v Jones, 179 AD3d 851, 852 [internal quotation marks omitted]; see Meade v Yland, 140 AD3d 931, 933). Here, issues of fact exist as to what medical functions were undertaken by Hindenburg and relied upon by the decedent, particularly in light of Hindenburg's medical specialties and acknowledgment that the decedent was sent to him without a diagnosis and with an unexplained complaint of fevers, Maller's deposition testimony that Hindenburg "took over the case," and the fact that the decedent did not return to Maller after being referred to Hindenburg (see Wiater v Lewis, 197 AD3d at 784; cf. Donnelly v Parikh, 150 AD3d 820, 822-823 [defendant orthopedic surgeon demonstrated, prima facie, that his duty of care did not extend to the alleged departures in diagnosing the plaintiff's lung cancer, through evidence that the plaintiff remained under the care of her primary care physician who had referred her to the defendant for the limited purpose of treating orthopedic issues]).
More importantly, the decedent's experts opined that medical oncologists are called upon to treat infectious processes and that the treatment rendered by Hindenburg, a physician board certified in oncology, hematology, and internal medicine, should have included a blood culture under the circumstances. My colleagues in the majority characterize the question of whether Hindenburg should have ordered a blood culture in light of the medical functions he undertook as being a legal question for the courts concerning the scope of his duty. I disagree, as the question of whether the standard of care for an oncologist/hematologist/internal medicine doctor under the circumstances underlying the referral and treatment rendered, required the doctor to perform a blood culture cannot be answered without medical expertise (cf. Alvarez v Prospect Hosp., 68 NY2d at 327 [plaintiff failed to raise a triable issue of fact on her theory that the duty of the defendant radiologist included consulting with attending physicians concerning his interpretation of X-rays because "some statement of expert medical opinion was required to demonstrate the viability" of that theory]; Elstein v Hammer, 192 AD3d 1075, 1078). The opinions of the medical community are necessary to determine whether proper medical care is in fact as highly compartmentalized as my colleagues in the majority would conclude. On that point, the decedent submitted expert opinions in support of her position that, under all of the circumstances, as part of his treatment of the decedent, Hindenburg should have included a blood culture with the other blood tests he was ordering, so as to check for infectious processes.
In rejecting the opinions of the decedent's experts in favor of the opinions of the Hindenburg defendants' expert, in interpreting ambiguous deposition testimony, and in making inferences from deposition testimony and medical records favorable to the moving parties, my colleagues in the majority exceed the proper role of the court on a motion for summary judgment. "It is not the function of a court deciding a summary judgment motion to make credibility determinations or findings of fact, but rather to identify material triable issues of fact (or point to the lack thereof)" (Vega v Restani Constr. Corp., 18 NY3d at 505). "Whatever the final judgment may be the [decedent was] entitled to have the issue[s] deliberately tried and [her] right to be heard in the usual manner of a trial protected" (Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [internal quotation marks omitted]).
My colleagues in the majority further conclude that the opinion of the decedent's expert surgical oncologist must be disregarded because he was unqualified to give an opinion as to the standard of care for a medical oncologist. However, "[a] physician need not be a specialist in a particular field to qualify as a medical expert" (Hiltz v DiLorenzo, 206 AD3d 631, 634 [internal quotation marks omitted]; Maestri v Pasha, 198 AD3d 632, 634 [internal quotation marks omitted]). The expert need only lay a sufficient foundation to support "the reliability of the opinion rendered" (Shectman v Wilson, 68 AD3d 848, 850; see Hiltz v DiLorenzo, 206 AD3d at 634; Maestri v Pasha, 198 AD3d at 634). Once such a foundation is laid, "any alleged lack of knowledge . . . [or] expertise goes to the weight and not the admissibility of the testimony" (Maestri v Pasha, 198 AD3d at 634 [internal quotation marks omitted]; see Hiltz v DiLorenzo, 206 AD3d at 634; Moon Ok Kwon v Martin, 19 AD3d 664).
Thus, in Maestri, in which the defendant gastroenterologists treated the plaintiff's decedent for abdominal distention and pain, this Court concluded that the plaintiff's expert "was qualified to offer an opinion despite being board certified only in internal medicine and not also in gastroenterology" because he or she had "set forth a sufficient foundation for his or her opinion, based on his or her clinical experience and familiarity with the applicable standards of care" (Maestri v Pasha, 198 AD3d at 635 [emphasis added]; see Hiltz v DiLorenzo, 206 AD3d at 634 [the plaintiff's pulmonary and cardiology experts were qualified to opine regarding the care and treatment rendered by a radiologist and radiological practice despite not also being board certified in radiology because they set forth a sufficient foundation for their opinions based on their clinical experience]).
In Shectman, on the other hand, this Court concluded that the affidavit of the plaintiffs' expert, who specialized in the fields of obstetrics and gynecology, lacked probative value with respect to the proximate cause of the infant plaintiff's pediatric developmental disabilities (see Shectman v Wilson, 68 AD3d at 849-850). This Court explained that the expert had not indicated that he had any training or expertise in pediatrics, psychiatry, or developmental disabilities, and did not "set forth how he was, or became, familiar with the applicable standards of care in this specialized area of practice" (id. at 849).
In contrast to Shectman, the decedent's expert in the present case—a surgical oncologist—laid a foundation supporting the reliability of his opinion, even though he was not also board certified in medical oncology. The surgical oncologist averred that he was familiar with the standards of care for medical oncologists treating patients who have or are suspected of having cancer by virtue of his clinical experience, gained from working in close conjunction with medical oncologists as a treatment team. Indeed, evidence submitted by the Hindenburg defendants in reply only served to bolster this foundation. Specifically, the Hindenburg defendants' evidence showed that in addition to surgical medicine societies, the decedent's expert oncologist belonged to the American Society of Clinical Oncology, "which predominantly is the medical oncology society," and that the decedent's expert served on advisory committees for the development of chemotherapy (a treatment within the purview of medical oncology). The Hindenburg defendants' evidence also supported the decedent's expert's averments in this case by demonstrating that surgical and medical oncology constitute "integrated disciplines" that work together "to come up with a comprehensive treatment plan" for cancer patients (see Cerrone v North Shore-Long Is. Jewish Health Sys., Inc., 197 AD3d 449, 451 ["the professional background of the defendants' expert was sufficient to support the inference that he was possessed of the requisite skill, training, education, knowledge, or experience from which it can be assumed that the opinion rendered was reliable"]).
All of this evidence amply laid a foundation for the reliability of the surgical oncologist's opinion regarding Hindenburg's treatment of the decedent, such that the Hindenburg defendants' contention that the expert lacked the requisite expertise would go "to the weight and not the admissibility of [his] testimony" (Maestri v Pasha, 198 AD3d at 634 [internal quotation marks omitted]; see Hiltz v DiLorenzo, 206 AD3d at 634; Moon Ok Kwon v Martin, 19 AD3d 664).
In sum, the decedent raised a triable issue of fact on the element of departure from accepted medical practice. Despite the Supreme Court's determinations on the issue of proximate cause, since the Hindenburg defendants made a prima facie showing only with respect to the element [*7]of departure, the decedent was not required to make any showing on the element of proximate cause in opposition (see Keane v Dayani, 178 AD3d 797, 799).
Accordingly, I would reverse the judgment, deny the Hindenburg defendants' motion for summary judgment dismissing the complaint insofar as asserted against them, and reinstate the complaint insofar as asserted against them.
ENTER:
Darrell M. Joseph
Acting Clerk of the Court