Estate of Harlow v Mashruwala (2025 NY Slip Op 50228(U))

[*1]

Estate of Harlow v Mashruwala

2025 NY Slip Op 50228(U)

Decided on February 24, 2025

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 24, 2025
Supreme Court, Kings County

The Estate of Tiffany Harlow, deceased, 
 by LATIESHA SOTO as Administrator, Plaintiff,

against
Neil Mashruwala, M.D., NICHOLAS POST, M.D., POST NEUROLOGICAL SURGERY, P.C., NEUROAXIS NEUROSURGICAL ASSOCIATES, P.C., BRIAN GIOVANNI, P.A., DAJUN SONG, M.D., VLADMIR PRYJDUN, M.D., RETIREMENT SOLUTIONS GROUP, HEATHER STUART-KING, M.D., NAPA MANAGEMENT SERVICES CORPORATION, NORTH AMERICAN PARTNERS IN ANESTHESIA, L.L.P., CHIN PARK, M.D., SREE PANDA, D.O., EMILIE JUIN-BAPTISTE, M.D., JOHN/JANE DOE, M.D., KINGSBROOK JEWISH MEDICAL CENTER and KINGSBROOK HEALTHCARE SYSTEM, INC., Defendants.

Index No. 507627/2019

Plaintiff
Frank A. Discipio, Esq. (fdiscipio@duffyduffylaw.com)
Duffy & Duffy, PLLC
1370 RXR Plaza
Uniondale, NY 11556
516-394-4200
Defendant Neil Mashruwala, M.D.
Megan A. Lawless, Esq. (m.lawless@bpn.law)
Barker Patterson Nichols, LLP
300 Garden City Plaza, Suite 100
Garden City, NY 11530
516-282-3355
Defendants Nicholas Post, M.D., Post Neurological Surgery, P.C., and Neuroaxis Neurosurgical Associates, P.C.
Rachel H. Poritz, Esq. (rporitz@splllp.com) Silverson, Pareres & Lombardi
170 Hamilton Avenue, Suite 310
White Plains, NY 10601
212-557-1818
Defendants Brian Giovanni, P.A., Chin Park, M.D., Sree Panda, D.O., Emilie Juin-Baptiste, M.D., Kingsbrook Jewish Medical Center, and Kingsbrook Healthcare System, Inc.
Ari Lessa, Esq. (alessa@kbrlaw.com)
Kaufman Borgeest & Ryan LLP
200 Summit Lake Dr
Valhalla, NY 10595
914-449-1078
Defendants Dajun Song, M.D., Vladimir Pryjdun, M.D., Heather Stuart-King, M.D., NAPA Management Services Corporation, and North American Partners in Anesthesia, LLP
Micah Ian Friedberg, Esq. (micah@vlmmr-law.com)
Vouté, Lohrfink, McAndrew & Meisner LLP
170 Hamilton Avenue, Suite 315
White Plains, NY 10601
914-946-1400

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF #s: Seq. 3: 195 — 196, 197 — 209, 325, 326 — 327, 331, 333 — 334
Seq. 6: 212 — 214, 215 — 225, 335 — 336
Seq. 8: 246 — 247, 248 — 252, 338
Seq. 9: 233 — 234, 235 — 245, 255 — 256, 328 — 330, 332, 337
Defendant Nicholas Post, M.D. ("Dr. Post) moves (Seq. No. 3) for an Order, pursuant to CPLR 3212, granting summary judgment in his favor, dismissing Plaintiff's complaint against him in its entirety, and removing him from the caption of the action.
Plaintiff opposes the motion of Dr. Post (Seq. No. 3).
Defendant Neil Mashruwala, M.D. separately moves (Seq. No. 6) for an Order, pursuant to CPLR 3212, granting summary judgment in his favor and dismissing Plaintiff's claims against him.
Defendants Dajun Song, M.D., Vladimir Pryjdun, M.D., Heather Stuart-King, M.D., Napa Management Services Corporation, and North American Partners in Anesthesia, LLP separately move (Seq. No. 8) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing all causes of action against them.
There is no opposition to the motions of Neil Mashruwala, M.D., Dajun Song, M.D., Vladimir Pryjdun, M.D., Heather Stuart-King, M.D., Napa Management Services Corporation, and North American Partners in Anesthesia, LLP. The motions on behalf of those defendants (Seq. 6 & 8) are granted without opposition, and all claims against them are hereby dismissed.
Defendants Brian Giovanni, P.A. ("P.A. Giovanni"), Chin Park, M.D. ("Dr. Park"), Sree Panda, D.O. ("Dr. Panda"), Emilie Juin-Baptiste, M.D. ("Dr. Juin-Baptiste"), and Kingsbrook Jewish Medical Center ("Kingsbrook"), also sued herein as Kingsbrook Healthcare System, Inc. separately move (Seq. No. 9) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing Plaintiff's complaint against them.
Plaintiff opposes the motion of Kingsbrook, P.A. Giovanni, Dr. Park, Dr. Panda, and Dr. Juin-Baptiste (Seq. No. 9) as to the claims against Kingsbrook, Dr. Panda, and Dr. Juin-Baptiste only. The branches of the motion seeking summary judgment for P.A. Giovanni and Dr. Park are granted without opposition, and all claims against P.A. Giovanni and Dr. Park, as well as any vicarious liability of Kingsbrook on their behalf, are dismissed.
Plaintiff commenced this action as temporary administrator [FN1]
of the estate of Tiffany Harlow ("Decedent" or "the patient"), asserting claims of medical malpractice, lack of informed consent, wrongful death, and negligent hiring, retention, credentialing, and/or supervision against the defendants herein, in connection with Decedent's development of a deep vein thrombosis, pulmonary embolism, and death following a surgical procedure.
At the time of the events at issue, Decedent was 32 years old. She was referred by her ophthalmologist to the Kingsbrook emergency department on March 27, 2017 with symptoms of pseudotumor cerebri, a condition which causes pressure in the skull, headaches, nerve palsy in the eye, and vision defects. She underwent a lumbar puncture on March 28, which revealed cerebrospinal fluid pressure. She was discharged the same day with instructions to return for possible placement of a ventriculoperitoneal (VP) shunt to drain excess fluid from the brain to the abdomen.
Decedent was first treated by defendant Dr. Post, a neurosurgeon at Kingsbrook, on April 4, 2017. Dr. Post performed a second lumbar puncture to confirm the diagnosis of pseudotumor cerebri.
On April 7, 2017, Dr. Post surgically placed a VP shunt. On April 8, Dr. Post performed a revision surgery and replacement of the VP shunt, based on a CT scan showing it was in a suboptimal position. She was transferred to the surgical ICU for recovery. The post-operative CT scan on April 9 showed it was in a satisfactory position.
At approximately 5:28 a.m. on April 10, 2017, Decedent's blood pressure was elevated at 206/107. Dr. Panda, the surgical ICU attending physician, placed two STAT orders for Lopressor by IV. Decedent's blood pressure and heart rate remained elevated at 5:36 a.m. and she reported chest tightness and shortness of breath. A Code 99 was called for critical life-saving measures sometime between 6:15 a.m. and 6:22 a.m. Decedent was intubated at 6:28 a.m. and CPR was performed. Dr. Juin-Baptiste led the resuscitation efforts.
Resuscitation efforts failed, and Decedent was pronounced dead at 7:40 a.m. An autopsy report determined her cause of death was pulmonary embolism from deep vein thrombosis in the [*2]left lower extremity following a VP shunt placement.
Plaintiff alleges that the moving defendants departed from the standard of care, specifically Dr. Post's alleged failure to properly evaluate Decedent as a candidate for surgery, and the failure of Dr. Panda and Dr. Juin-Baptiste to timely diagnose and treat her pulmonary embolism after the procedure. Plaintiff alleges Kingsbrook is vicariously liable for the aforementioned physicians. Plaintiff further alleges that these departures were a proximate cause of Decedent's injuries and death.
In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department:
"The elements of a medical malpractice cause of action are a deviation or departure from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries. When moving for summary judgment, a defendant provider has the burden of establishing the absence of any departure from good and accepted medical practice or that the plaintiff was not injured thereby. In order to sustain this burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's bill of particulars. In opposition, the plaintiff must demonstrate the existence of a triable issue of fact as to the elements on which the defendant has met his or her initial burden. General allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat a defendant's summary judgment motion. Although summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions, expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman v Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023] [internal quotation marks and citations omitted].
In support of Dr. Post's motion, the movant submits an expert affirmation from John Pollina, Jr., M.D. ("Dr. Pollina"), a licensed physician certified in neurosurgery. He states that he is familiar with the accepted standard of care for the issues involved in this action, through his training and experience with VP shunt procedures.
Dr. Pollina opines that at all times the treatment and care provided by Dr. Post was in compliance with good and accepted medical standards. He opines that on April 4, 2017, Dr. Post performed a proper pre-operative workup including a diagnostic lumbar puncture which confirmed the patient had pseudotumor cerebri. He notes that her ophthalmology evaluation also indicated she had "clinical vision issues" including swelling of the optic discs and field of vision deficits. Based on this diagnosis and symptoms, Dr. Pollina opines that it was appropriate and within the standard of care to perform a VP shunt placement to prevent her condition from progressing to full vision loss. Dr. Pollina also opines that Dr. Post did not fail to properly assess her risk of deep vein thrombosis or pulmonary embolism, as she had been assessed as "low risk" for deep vein thrombosis in her pre-operative workup by other Kingsbrook providers.
Dr. Pollina opines in detail, based on the operative report, that the surgery on April 7, 2017 was "properly performed in all respects" by Dr. Post. He further opines that Dr. Post properly reviewed the post-operative CT scan and performed a second surgery on April 8 due to the suboptimal placement of the VP shunt. Dr. Pollina opines that malplacement requiring repositioning is a known risk which occurs in about 5% of patients, and that it was not the result [*3]of any negligence or departure from the standard of care. He opines that Dr. Post's revision surgery to place the shunt catheter in a better position was appropriately and timely performed. Dr. Pollina notes that a post-operative ex-ray and CT scan showed the VP shunt was appropriately positioned and working properly following the April 8 surgery.
Dr. Pollina notes that Dr. Post had no further involvement with Decedent's treatment in the ICU on April 9 and April 10, and that he was not contacted by ICU staff until after her death. He also opines that mechanical prophylaxis (compression of the legs) was in accordance with the standard of care, and Dr. Post did not depart from the standard of care by not also prescribing or ordering anticoagulation medication. In the expert's opinion, such medication was indicated for a patient deemed to be low risk for deep vein thrombosis/pulmonary embolism and higher risk for hemorrhage.
Dr. Pollina further opines that no errors or departures from the standard of care on the part of Dr. Post were a proximate cause of Plaintiff's claimed injuries, specifically her development of a pulmonary embolism and death. He opines that the need for repositioning surgery on April 8 did not cause any injury or worsening of her condition. He also opines that Decedent's autopsy did not evince any "poor surgical technique, nor any findings that would be unexpected after the procedure that the patient underwent from a neurosurgical point of view." He opines that it was the patient's obesity and hypertensive cardiovascular disease which contributed to her post-operative complications, cardiac arrest, and death, and there was no causal relationship to any improper neurosurgical treatment by Dr. Post.
Additionally, Dr. Pollina opines that Dr. Post appropriately obtained Decedent's informed consent for both the April 7 and April 8 procedures, that he disclosed the foreseeable risks (including hardware misplacement) prior to her signing the consent forms, and that she knew the alternative of not proceeding with surgery but was correctly "advised that a VP shunt was emergently needed to avoid blindness."
Based on the expert's submissions, Dr. Post has established prima facie entitlement to summary judgment on the basis that Dr. Post complied at all times with the standard of care and that no alleged departures in his treatment were a proximate cause of Decedent's pulmonary embolism or death. Dr. Post also established entitlement to summary judgment on the informed consent claim, based on the parties' testimony, medical records, and the expert's opinion that the risks, benefits, and alternatives were properly disclosed to the patient before signing the consent forms (see Pirri-Logan v Pearl, 192 AD3d 1149 [2d Dept 2021]). Furthermore, because a death caused by the party's negligence or wrongdoing is an essential element of a wrongful death claim, Dr. Post has also established entitlement to summary judgment on the wrongful death cause of action. The burden therefore shifts to Plaintiff to raise an issue of fact.
In opposition to Dr. Post's motion, Plaintiff submits an expert affirmation from a licensed physician (name of expert redacted), certified in internal medicine. The Court was presented with an unredacted copy of the affirmation for in camera inspection.
"[W]here a physician opines outside his or her area of specialization, a foundation must be laid tending to support the reliability of the opinion rendered" (Hannen v Nici, 218 NYS3d 127 [2d Dept 2024], quoting Abruzzi v Maller, 221 AD3d 753, 756 [2d Dept 2023]). Though not a board-certified specialist in the field of neurosurgery, Plaintiff's expert lays a proper foundation to opine on the issues herein by stating that they have performed "thousands of perioperative evaluations including in the setting of neurological procedures," and that they are "familiar with the perioperative standard of care for neurological procedures" at the time of the treatment at [*4]issue. The expert also states they are experienced with the appropriate standard of care for "the associated risk factors, symptoms, and treatments" of pulmonary embolism and deep vein thrombosis, and "the medical clearance for a patient undergoing a VP shunt placement."
Plaintiff's expert submissions regarding Dr. Post are limited to his pre-operative evaluation and decision to proceed with the April 7 and April 8 surgeries. The expert does not raise any issue of fact as to the actual performance of the surgery from a neurosurgical standpoint. Rather, as the affirmation relates to Dr. Post, the expert's focus is on his alleged departures from the standard of care in assessing the patient's risk for deep vein thrombosis/pulmonary embolism and medically clearing her for surgery. The Court finds that this expert has adequately laid a foundation to opine on these issues based on their training and experience in perioperative care (from admission to recovery) and the risk factors and treatment for pulmonary embolism.
Plaintiff's expert opines that prior to Decedent's surgery on April 7, Dr. Post "failed to consider and appropriately workup" two recent EKGs in the patient's record which showed abnormalities on March 9, 2017 and March 29, 2017. The expert notes that the March 9 EKG reported "nonspecific T wave abnormality," and the expert further interpreted the results to show signs of "acute pressure and volume overload of the right ventricle because of pulmonary hypertension," which is "present in approximately 25% of patients ultimately diagnosed with pulmonary emboli." The expert notes that this same abnormality was present in the EKG from March 29, 2017. The expert opines that these results were "medically alarming in such a young patient" in her 30s, and they were available to Dr. Post in the patient's medical chart when he examined her on April 4, 2017 and when he cleared her for surgery on April 7 and repositioning surgery on April 8.
The expert further opines that an echocardiogram should have been performed prior to the surgery, in light of these EKG findings, and Dr. Post departed from the standard of care by proceeding with the surgery without one. In the expert's opinion, it was a departure from the standard of care for Dr. Post to fail to appreciate the two EKGs and send the patient for further cardiac workup or consult (specifically an echocardiogram) before any surgical procedure was undertaken.
The expert counters the opinion of the movant's expert Dr. Pollina that the VP shunt placement was an emergent surgery to prevent blindness, which outweighed other health risks. The expert disputes the urgency of the procedure, as it was undertaken several days after her diagnosis, and opines that preventing vision loss did not outweigh the "critical health risks" of proceeding with an invasive procedure on a patient with compromised cardiovascular health.
On the issue of proximate causation, the expert opines that had a further cardiac workup and echocardiogram been completed, it would have most likely revealed a developing deep vein thrombosis with right ventricular dilation, and that she was not a proper candidate for surgery. The expert explains that when a patient has deep vein thrombosis, typically manifesting as a blood clot in the leg, the clot can dislodge and travel to the lungs causing a pulmonary embolism. Patients with immobility, obesity, and who have had recent surgery are at higher risk for blood clots and pulmonary embolism, and the record indicates Decedent's pulmonary embolism did occur as a complication of the surgery. As such, the expert opines that Dr. Post's alleged departure from the standard of care by improperly clearing her for surgery despite her EKG findings and without further cardiac testing was a proximate cause of the progression of her deep vein thrombosis, pulmonary embolism, and death.
Based on the submissions of Plaintiff's expert, there are issues of fact which preclude summary judgment for Dr. Post on the medical malpractice and wrongful death claims. Dr. Post's expert opines that the VP shunt placements were appropriately recommended and performed, and that the available records and other physicians' evaluations did not indicate she was at risk for deep vein thrombosis. In contrast, Plaintiff's expert opines that Dr. Post — as the surgeon primarily responsible for her pre-operative evaluation and medically clearing her for the procedures — departed from the standard of care by failing to appreciate her "red flags" for deep vein thrombosis/pulmonary embolism. Plaintiff's expert opines this risk was evidenced by her recent EKGs and required further cardiac evaluation and clearance, which should have been obtained by Dr. Post before he proceeded with the surgeries at all.
Plaintiff's expert also counters the movant's expert with regard to the proximate causation link between the surgeries performed and Decedent's pulmonary embolism and death, which the expert opines was a direct complication of the surgery that could have been avoided with a proper pre-operative risk assessment.
The Court has considered the defendants' reply argument that Plaintiff raised a new theory of liability —Decedent's EKG abnormalities — that was never asserted in their bill of particulars. The Court notes that Dr. Post's moving papers do address the Plaintiff's bill of particulars claim that "Dr. Post failed to properly conduct an appropriate DVT [deep vein thrombosis] risk assessment." Kingsbrook also addresses this claim in their motion for summary judgment, stating that a risk assessment was performed which "would have included reviewing the medical history for any co-morbidities that increased the risk of bleeding, DVT, and/or PE." The moving experts opined that Decedent "was properly assessed as not being at high risk," going into detail as to the specific factors which were considered. It is therefore not inappropriate for the Plaintiff's expert to rely on evidence from the hospital records which, in their opinion, should have been considered and indicated she was at a higher risk.
"When experts offer conflicting opinions, a credibility question is presented requiring a jury's resolution" (Stewart v North Shore University Hospital at Syosset, 204 AD3d 858, 860 [2d Dept. 2022], citing Russell v Garafalo, 189 AD3d 1100, 1102 [2d Dept. 2020]). Here, the conflicting opinions by the parties' experts present clear issues of fact which must be resolved by a jury.
Plaintiff's expert does not raise any issues of fact as to the lack of informed consent claim, nor is the issue addressed in their opposing papers. Accordingly, Dr. Post's motion for summary judgment is granted as to the informed consent cause of action only, and his motion is otherwise denied.
Turning to the motion of Kingsbrook, Dr. Panda, and Dr. Juin-Baptiste (Seq. No. 9), the movants submit an expert affirmation from Steve Salzman, M.D. ("Dr. Salzman"), a licensed physician certified in internal medicine, pulmonary disease, and critical care medicine. The movants also submit an expert affirmation from Robert Goodman, M.D. ("Dr. Goodman"), a licensed physician certified in neurological surgery.
The Court notes that Kingsbrook does not dispute their vicarious liability for the acts and omissions of co-defendant Dr. Post. It is uncontested that Dr. Post treated Decedent as a Kingsbrook employee after she was referred to the hospital for treatment. However, Kingsbrook seeks to establish through their expert affirmation that Dr. Post did not deviate from the standard of care in recommending and performing the surgery.
Kingsbrook's surgical expert, Dr. Goodman, briefly addresses the claims against Dr. Post, [*5]opining that "it was proper for Dr. Post to perform surgery to place a VP shunt" in light of Decedent's clinical symptoms, and that he "appropriately recommended" and performed the repositioning surgery on April 8.
To the extent that Kingsbrook's expert opines that Dr. Post did not depart from the applicable standard of care, these arguments have already been substantively addressed in Dr. Post's individual motion. Plaintiff submits the same expert affirmation in opposition to this motion, raising issues of fact as to Dr. Post's pre-operative assessment and recommendation of surgery.
As discussed above, the Court finds that there are issues of fact precluding summary judgment on the issue of Dr. Post's liability. Therefore, the branch of Kingsbrook's motion seeking summary judgment as to their vicarious liability for Dr. Post is denied.
With respect to the claims against ICU physician Dr. Panda, the movant's critical care expert Dr. Salzman opines that until the morning of April 10, 2017 at approximately 5:45 a.m., Decedent "was in no distress and she had no signs or symptoms" of deep vein thrombosis or pulmonary embolism. He opines that Dr. Panda appropriately responded to her complaints of constipation and elevated blood pressure at 10:00 p.m. on April 9, but her vital signs and oxygen saturation otherwise remained normal. He opines that when her blood pressure spiked again between 5:00 a.m. and 5:30 a.m., Dr. Panda appropriately ordered Lopressor and presented to her bedside.
Dr. Salzman opines that once Decedent's condition changed, her decompensation was rapid and there was no way Dr. Panda could have diagnosed pulmonary embolism as the cause; the only way to make a definitive diagnosis would be a CT angiogram, which would require transport to the radiology department. Dr. Salzman opines that Dr. Panda acted within the appropriate standard of care by attempting to stabilize Decedent in the "closely monitored setting" of the ICU, rather than attempt to move her to radiology. From that point on, Dr. Salzman opines that Decedent's condition deteriorated too quickly "with rapid progression from onset of symptoms to full cardiopulmonary arrest," and Dr. Panda responded within good and accepted medical standards, employing a nonrebreather mask, bag-valve-mask, and right femoral IV to administer epinephrine and other medications.
The movants' neurosurgical expert, Dr. Goodman, also opines that Dr. Panda acted in compliance with the standard of care in response to Decedent's elevated blood pressure and rapid decompensation the morning of April 10. Dr. Goodman opines that she appropriately administered Lopressor, then placed a 100% non-breather mask with bronchodilators in response to her shortness of breath. When her oxygen level remained low, Dr. Panda further supported her breathing with a bag-valve-mask device and additional medications for her heart. At approximately 6:15 a.m., Dr. Panda called a Code 99 because Decedent had lost palpable pulse. Dr. Goodman opines that Dr. Panda's response to her cardiopulmonary distress during this period was within good and accepted medical standards.
On the actions of Dr. Juin-Baptiste, Dr. Goodman opines that there were no departures from the standard of care in her Code 99 resuscitation efforts. The expert opines that Decedent was promptly intubated with anesthesia by 6:25 a.m., a central femoral vein line was in place, and CPR efforts were maintained with chest compression and epinephrine for over an hour.
Both experts opine that there was little treatment that would have been possible on the morning of April 10 when Decedent began deteriorating. Dr. Salzman states that the "clot busting agent" tissue plasminogen activator is "the only treatment" to break up a deep vein [*6]thrombosis and pulmonary embolism. However, he opines that it is not required by the standard of care to administer this treatment to a patient who recently underwent brain surgery, especially if pulmonary embolism is unconfirmed, due to the high risk of causing "other complications, including a catastrophic brain hemorrhage." Dr. Goodman further opines that Decedent's deep vein thrombosis and pulmonary embolism could not have been diagnosed "without a CT angiogram, which would have required transporting her to radiology." He opines that her cardiac and respiratory condition was too unstable by that point for such diagnosis or treatment.
The experts opine that no alleged departures of the Kingsbrook physicians were a proximately cause of Decedent's injuries or death. Both experts state that Decedent's cause of death was her "significant underlying cardiac disease complicated by acute pulmonary embolism" and could not have been prevented by the defendants herein. They opine that no care provided by Dr. Panda and Dr. Juin-Baptiste, immediately prior to and during her cardiac arrest, would have changed the outcome for Decedent, because her decline was too rapid from the onset of symptoms, and there was no way to confirm a diagnosis of pulmonary embolism and administer tissue plasminogen activator.
Based on the submissions, the movants have established prima facie entitlement to summary judgment on the claims related to Dr. Panda and Dr. Juin-Baptiste, setting forth that these physicians complied with the standard of care and did not proximately cause Decedent's injuries or death. The movants have also established summary judgment as to the wrongful death claim, based on the same experts' submissions. The burden therefore shifts to Plaintiff to raise an issue of fact.
In opposition, Plaintiff submits a redacted expert affirmation from a certified internal medicine physician. The Court was presented with a signed, unredacted copy for in camera inspection.
As discussed earlier, an expert opining outside their "area of specialization" must demonstrate that they are "possessed of the requisite skill, training, education, knowledge, or experience from which it can be assumed that the opinion rendered is reliable" (Hannen v Nici, at 1120). Plaintiff's expert states that they "actively participate in perioperative medicine at an academic medical center and evaluate medical cases three to four days per week." In addition to setting forth their qualifications to opine on perioperative evaluation and care, Plaintiff's expert affirms that they are specifically familiar with the standard of care for treating patients with pulmonary diseases and critical illness, as well as the risk factors, symptoms, and treatments for pulmonary embolism and deep vein thrombosis. The primary issues of this case are not specific to a neurosurgical background but to the standard of care for pre- and post-operative patients, and the patient's risk factors and treatment for surgical complications, specifically pulmonary embolism. Thus, the Court finds the expert has laid a proper foundation to render their opinions on the issues herein.
Plaintiff's expert opines that Decedent's two neurosurgical procedures, obesity, and immobility post-surgery all elevated her risk for deep vein thrombosis and pulmonary embolism, and that Dr. Panda failed to adequately monitor and treat Decedent as the ICU attending physician. The expert opines that Dr. Panda failed to appreciate Decedent's "clear signs of respiratory distress, hypertension, and impending cardiopulmonary collapse on the morning of April 10, 2017" and did not timely order diagnostic testing (including CT angiogram) or call a Code 99. The expert opines that Decedent's severely elevated blood pressure, elevated heart rate, chest tightness, and shortness of breath, combined with her high risk for pulmonary embolism, [*7]called for an escalation of care and differential diagnosis considering pulmonary embolism.
Additionally, Plaintiff's expert opines that Dr. Panda departed from the standard of care by administering doses of Lopressor on the morning of April 10 at 5:11 a.m., 5:20 a.m., and 5:45 a.m., which "artificially suppressed" her pulse rate and contributed to the inability to diagnose her pulmonary embolism.
Plaintiff's expert further opines that Dr. Panda delayed in intubating Decedent when she began showing signs of respiratory failure. Decedent was ultimately intubated at approximately 6:25 a.m. The expert opines that it was a deviation from the standard of care for Dr. Panda to wait approximately 30 minutes from the patient's first complaints of chest tightness and difficulty breathing (at 5:45 a.m.) to call a Code 99 and institute life-saving measures including "emergent intubation and arterial line placement."
Plaintiff's expert does not argue that tissue plasminogen activator should have been administered, but instead that Decedent's pulmonary embolism should have been identified sooner and treated with an interventional thrombectomy. The expert counters the movant's opinion that tissue plasminogen activator was the only possible treatment and instead opines that "the patient would have been a candidate for an interventional thrombectomy" to clear the blood clot if it had been properly diagnosed or a Code 99 had been called sooner. Plaintiff's expert disputes the argument of the movants' experts that her deterioration was too rapid to confirm a diagnosis and break up the blood clot. During the "critical 30-minute delay" between the recording of Decedent's clinical symptoms and the Code 99, the expert opines that "rapid response measures such as emergent imaging and interventional thrombolytic therapy" could and should have been undertaken while the patient was stabilized.
Plaintiff's expert also opines that once the Code 99 was called, Dr. Juin-Baptiste "failed to consider treatment options" for a pulmonary embolism including emergent interventional thrombectomy. The expert opines that as the physician in charge of Decedent's emergency resuscitation efforts, the standard of care required Dr. Juin-Baptiste to "consider why the patient exhibited acute cardiopulmonary decompensation" and consider treatment options for the underlying issue in addition to intubation and arterial line placement.
Further, Plaintiff's expert opines that all these alleged departures from the standard of care proximately caused the worsening of Decedent's pulmonary embolism and death. Plaintiff's expert opines that the alleged 30-minute delay in calling a Code 99 and initiating intubation was a contributing factor in Decedent's "deterioration in oxygenation and circulation, resulting in cardiac arrest." The expert also opines that earlier intubation would have allowed more time and options for diagnosing and treating her pulmonary embolism — with a CT angiogram and interventional thrombectomy to clear the blood clot — before she went into cardiac arrest. The expert opines that these alleged departures were therefore a contributing factor in her death and deprived her of the chance for a better outcome.
Based on the submissions, Plaintiff's expert has raised issues of fact precluding summary judgment with respect to Dr. Panda. There are clear conflicts established by the experts as to whether Dr. Panda complied with the standard of care in response to Decedent's post-operative symptoms, the timeliness of her Code 99 intubation, and whether a CT angiogram and thrombectomy should have been performed. Plaintiff's expert also raises issues of fact as to whether these acts and omissions proximately caused the progression of her pulmonary embolism, cardiorespiratory failure, and death. For these reasons, Dr. Panda's motion for summary judgment is denied as to the medical malpractice and wrongful death claims. By [*8]extension, Kingsbrook's motion for summary judgment is denied as to their vicarious liability for Dr. Panda.
However, Plaintiff's expert fails to raise a triable issue of fact as to Dr. Juin-Baptiste, the physician who led the resuscitation attempt beginning on or about 6:25 a.m. until 7:30 a.m., during which time Decedent was "pulseless" and ultimately pronounced dead. The expert does not detail any alleged departures from the standard of care attributable to Dr. Juin-Baptiste, except in a single paragraph where the expert opines she "failed to consider" interventional thrombectomy. The expert does not articulate the applicable standard of care for "considering" pulmonary embolism treatment during emergency resuscitation efforts. As the movants note in reply, Dr. Juin-Baptiste was not deposed in this action and there is no evidence in the record as to what treatments she "considered," making the expert's statements wholly speculative and conclusory. Expert opinions that are conclusory, speculative, and unsupported by "specifically cited evidence in the record" do not raise genuine, triable issues of fact (Wagner v Parker, 172 AD3d 954, 955 [2d Dept 2019] [internal citations omitted]). For this reason, the branch of the summary judgment motion seeking dismissal of all claims against Dr. Juin-Baptiste, as well as Kingsbrook's vicarious liability for those claims, is granted.
On the issue of informed consent, the movants' experts both opine that consent for the VP shunt procedures was properly obtained by Dr. Post, as documented in the Kingsbrook hospital records. The movants note that the claims related to disclosure of risks and obtaining informed consent apply only to Dr. Post and not any other Kingsbrook physicians. Therefore, they established prima facie entitlement to summary judgment on the lack of informed consent claim, for the same reasons discussed in Dr. Post's motion above.
The movants also argue as a matter of law that Plaintiff cannot maintain a cause of action against Kingsbrook for negligent hiring, retention, supervision, or credentialing, as this is an alternative theory of liability in the absence of a "scope of employment" relationship. "[W]here an employer is liable for the employee's negligence under the theory of respondeat superior, the plaintiff may not proceed with a cause of action to recover damages for negligent hiring and retention" (Tabchouri v Hard Eight Restaurant Company, LLC, 219 AD3d 528, 533 [2d Dept 2023], quoting Ashley v City of New York, 7 AD3d 742 [2d Dept 2004]). It is undisputed by the parties that Kingsbrook was the employer of the remaining named defendants in this action, including co-defendant Dr. Post, and that they are vicariously liable to the extent their physicians and staff are found liable for malpractice and/or wrongful death. The cause of action for negligent hiring, retention, supervision, or credentialing is therefore inapplicable to the facts in the record.
Plaintiff does not raise any issues of fact as to lack informed consent or negligent hiring, retention, credentialing, and/or supervision, and these issues are not addressed in their opposition papers. Therefore, summary judgment is granted to Kingsbrook as to these claims only.
Lastly, the Court notes that the caption of this action includes unnamed "John/Jane Doe, M.D." defendants. As the statute of limitations for Plaintiff's claims has expired and no additional physicians have been identified and served, those unnamed defendants shall be removed from the caption. This action has been discontinued against Post Neurological Surgery, P.C. and Neuroaxis Neurological Associates, P.C. (see NYSCEF Doc. 145, 156) and they are also hereby removed from the caption.
Accordingly, it is hereby:
ORDERED that Dr. Post's motion (Seq. No. 3) for an Order, pursuant to CPLR 3212, [*9]granting summary judgment in his favor, dismissing Plaintiff's complaint against him in its entirety, and removing him from the caption of the action, is GRANTED TO THE EXTENT of dismissing the cause of action for lack of informed consent against him, and the motion is otherwise DENIED; and it is further
ORDERED that Neil Mashruwala, M.D.'s motion (Seq. No. 6) for an Order, pursuant to CPLR 3212, granting summary judgment in his favor and dismissing all claims against him, is GRANTED without opposition; and it is further
ORDERED that the motion (Seq. No. 8) of Dajun Song, M.D., Vladimir Pryjdun, M.D., Heather Stuart-King, M.D., Napa Management Services Corporation, and North American Partners in Anesthesia, LLP for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing all claims against them, is GRANTED without opposition; and it is further
ORDERED that the motion (Seq. No. 9) of Kingsbrook, P.A. Giovanni, Dr. Park, Dr. Panda, and Dr. Juin-Baptiste for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing Plaintiff's complaint against them, is GRANTED TO THE EXTENT of dismissing all claims against P.A. Giovanni without opposition, dismissing all claims against Dr. Park without opposition, dismissing all claims against Dr. Juin-Baptiste, dismissing any vicarious liability claims against Kingsbrook on behalf of P.A. Giovanni, Dr. Park, and Dr. Juin-Baptiste, dismissing all claims for lack of informed consent, and dismissing all claims for negligent hiring/retention/credentialing/supervision; and the motion is DENIED with respect to the medical malpractice and wrongful death claims against Dr. Panda, and the vicarious liability of Kingsbrook for Dr. Panda and Dr. Post; and it is further
ORDERED that the caption is amended to read as follows:
The Estate of TIFFANY HARLOW, deceased, by
LATIESHA SOTO as Administrator,
Plaintiff, 
against
NICHOLAS POST, M.D., RETIREMENT SOLUTIONS GROUP, SREE PANDA, D.O., KINGSBROOK JEWISH 
MEDICAL CENTER and KINGSBROOK HEALTHCARE SYSTEM, INC.,
Defendants.
The Clerk shall enter judgment in favor of NEIL MASHRUWALA, M.D., BRIAN GIOVANNI, P.A., DAJUN SONG, M.D., VLADIMIR PRYJDUN, M.D., HEATHER STUART-KING, M.D., NAPA MANAGEMENT SERVICES CORPORATION, NORTH AMERICAN PARTNERS IN ANESTHESIA, LLP, CHIN PARK, M.D., and EMILIE JUIN-BAPTISTE, M.D.
This constitutes the decision and order of this Court.
ENTER.
Hon. Consuelo Mallafre Melendez
J.S.C.

Footnotes

Footnote 1: Plaintiff was later issued full letters of administration by Surrogate's Court on November 22, 2024, and the caption was amended accordingly.