Cosgrove v North Shore Univ. Hosp. (2025 NY Slip Op 25136)

[*1]

Cosgrove v North Shore Univ. Hosp.

2025 NY Slip Op 25136

Decided on June 10, 2025

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on June 10, 2025
Supreme Court, Kings County

Dennis Cosgrove, EXECUTOR OF THE 
 ESTATE OF MEGAN COSGROVE, DECEASED, Plaintiff,

against
North Shore University Hospital, NORTHWELL HEALTH, INC. f/k/a NORTH SHORE-LONG ISLAND JEWISH HEALTH SYSTEM, INC., NORTH SHORE OB-GYN, P.C., WOMENS HEALTH PROFESSIONALS, LLP, ILIA CALLUZZO, M.D., GILAD GREENBERG, M.D., RICHARD HERZOG, M.D., RANDI ROTHSTEIN, M.D., OMAR BHOLAT, M.D., CHAD EDWARD WATSON, EXECUTOR OF THE ESTATE OF KATARZYNA SUFFECOOL, M.D., AHMAD LATEFI, M.D., JACOB JANUSZEWSKI, M.D., SHAMIK CHAKRABORTY, M.D., JUDITH A. BRADY, EXECUTOR OF THE ESTATE OF JOHN BRADY M.D., JENNY TAM, M.D., AMANDEEP SINGH, M.D., ANAR YUKHAYEV, M.D., FRANCES F. HSIEH, M.D., DENISE MOSES, M.D., GRACE CHOW, M.D., LAUREN OSTRY, M.D., and CHRISTINE WIEST, P.A., Defendants.

Index No. 521154/2016

Plaintiff
Mitchell R. Drach, Esq. ([email protected])
Torgan Cooper & Aaron, P.C.
17 State Street, 3900
New York, NY 10004
212-232-2500
Defendants North Shore University Hospital, Northwell Health, Inc. f/k/a North Shore-Long Island Jewish Health System, Inc., Omar Bholat, M.D., Chad Edward Watson, Executor of the Estate of Katarzyna Suffecool, M.D., Ahmad Latefi, M.D., Jacob Januszewski, M.D., Shamik Chakraborty, M.D., Jenny Tam, M.D., Amandeep Singh, M.D., Anar Yukhayev, M.D., Frances F. Hsieh, M.D., Denise Moses, M.D., Grace Chow, M.D., Lauren Ostry, M.D., and Christine Wiest, P.A.
Michael Philip Pitre, Esq. ([email protected])
Shaub, Ahmuty, Citrin & Spratt, LLP
1983 Marcus Ave, Ste 260
New Hyde Park, NY 11042-1056
516-326-7131
Defendants North Shore Ob-Gyn, P.C., Women's Health Professionals, LLP, Ilia Calluzzo, M.D., Gilad Greeenberg, M.D., Richard Herzog, M.D., and Randi Rothstein, M.D.
Gabrielle F. Murray, Esq. ([email protected])
Martin Clearwater & Bell LLP
220 East 42nd Street
New York, NY 10017
212-697-3122
Defendant Judith A. Brady, Executor of the Estate of John Brady, M.D.
Daniel William Milstein, Esq. ([email protected])
Aaronson Rappaport Feinstein and Deutsch
600 Third Avenue
New York, NY 10016
212-593-5366

Consuelo Mallafre Melendez, J.

Defendant Northwell Health, Inc., sued herein as "Northwell Health, Inc. f/k/a North Shore-Long Island Jewish Health System, Inc.," moves (Seq. No. 7) for an Order, pursuant to CPLR 3212, granting summary judgment in favor of Northwell Health, Inc. and dismissing Plaintiff's complaint against them.
Defendant Judith A. Brady, as Executor of the Estate of John Brady, M.D. ("Dr. Brady") separately moves (Seq. No. 8) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing all claims and causes of action against them.
Defendants North Shore Ob/Gyn, P.C.[FN1]
, Women's Health Professionals, LLP, Ilia Calluzzo, M.D. ("Dr. Calluzzo"), Gilad Greenberg, M.D. ("Dr. Greenberg"), Richard Herzog, M.D. ("Dr. Herzog"), and Randi Rothstein, M.D. ("Dr. Rothstein") separately move (Seq. No. 9) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing Plaintiff's complaint against them.
Plaintiff opposes all three motions as to Defendants Northwell Health, Inc., Dr. Brady, North Shore Ob/Gyn, P.C., Women's Health Professionals, LLP, Dr. Calluzzo, and Dr. Herzog.
Plaintiff does not oppose the part of the motions (Seq. No. 9) seeking summary judgment [*2]on behalf of Dr. Greenberg or Dr. Rothstein. Accordingly, that part of the motion is granted without opposition, and Plaintiff's complaint is dismissed against Dr. Greenberg and Dr. Rothstein only. Any vicarious liability claims against North Shore Ob/Gyn, P.C. and Women's Health Professionals, LLP on behalf of Dr. Greenberg and Dr. Rothstein are also dismissed.
Plaintiff commenced this action on November 30, 2016, asserting claims of medical malpractice and wrongful death on behalf of Decedent's estate against the moving defendants and others. The claims arise from labor, c-section, and postpartum complications which led to Decedent's death on November 29, 2015.
Prior to the events at issue, Decedent received prenatal care throughout her first-time pregnancy from Dr. Rothstein, Dr. Herzog, and Dr. Greenberg at North Shore Ob/Gyn, P.C. from April through November 2015.
On November 24, 2015, Decedent saw Dr. Calluzzo at North Shore Ob/Gyn, P.C. for a fetal heart rate test. At that time, she was 36 years old, just over 40 weeks pregnant, and had slightly elevated blood pressure of 130/80.
On November 27 at 11:43 a.m., Decedent presented to North Shore University Hospital with premature rupture of membranes. She was evaluated by an obstetrical resident, not yet dilated, and discharged around 1:10 p.m. with instructions to ambulate and return in two hours. She was readmitted to North Shore University Hospital at 3:25 p.m. She was treated by residents under the direction of her private attending physician, Dr. Calluzzo.
Dr. Calluzzo was bedside with Decedent at approximately 6:00 p.m. and authored a plan of care of inducing labor with Cytotec. She then left the hospital, leaving residents and nursing staff to monitor Decedent's early stages of labor.
Throughout the evening, Decedent's blood pressure was noted to be elevated multiple times, as high as 179/81, but marked "BP taken during [contractions]." Her blood pressure was not rechecked for an extended period between 7:43 p.m. and 11:43 p.m. or between 12:03 a.m. and 2:13 a.m. Dr. Calluzzo testified that she was not notified of any abnormal blood pressure readings.
Decedent requested an epidural at 2:26 a.m., and an order for an epidural and Pitocin was placed by a resident after a telephone call with Dr. Calluzzo. At approximately 2:45 a.m. on November 28, anesthesiologist Dr. Brady administered an epidural to Decedent with assistance of a registered nurse anesthetist. Decedent's blood pressure at that time was 135/65. The epidural was completed with continuous pump at 3:01 a.m., and the nurse anesthetist monitored the patient for side effects of the epidural, which included monitoring her blood pressure. Over the next hour, Decedent's blood pressure remained hypertensive with readings as high as 160/72.
The ob/gyn residents began taking interval blood pressure readings at 4:12 a.m., which were consistently elevated. At 4:55 a.m., a resident ordered labs for HELLP syndrome (Hemolysis, Elevated Liver enzymes, Low Platelet count), a severe pregnancy complication associated with preeclampsia. Dr. Calluzzo testified this was the first time she was notified about the elevated blood pressure and HELLP labs, and she returned to the hospital at 5:30 a.m.
At 5:47 a.m., Decedent's labs returned showing elevated liver enzymes and decreased platelet count consistent with HELLP syndrome. By this time, her blood pressure was 193/97, and she was experiencing blurry vision and headaches. Dr. Calluzzo ordered blood pressure lowering medication and seizure prophylaxis. At 6:25 a.m., Dr. Calluzzo initiated a c-section and delivered Decedent's baby at 7:05 a.m. Dr. Brady provided anesthesia during the c-section.
At approximately 8:00 a.m., Dr. Herzog took over as the attending ob/gyn, having [*3]discussed the case by telephone with Dr. Calluzzo. Decedent was transferred to the Post-Anesthesia Care Unit. Dr. Herzog testified that he was first informed by the ob/gyn resident at 9:33 a.m. that Decedent had bleeding and low blood pressure and had been given Cytotec to control the bleeding. Dr. Herzog arrived at North Shore University Hospital at 10:00 a.m. He determined Decedent's labs were consistent with DIC (disseminated intravascular coagulation) and requested blood transfusions and a hematology and SICU consult. Decedent was transferred to the SICU around 1:00 p.m.
Subsequently, Decedent became unresponsive at 5:55 p.m. and a head CT scan revealed brain hemorrhage and herniation. She ultimately passed away on November 29. An autopsy determined her cause of death was anoxic encephalopathy from intracerebral hemorrhage, caused by preeclampsia with HELLP syndrome and coagulopathy.
Plaintiff alleges that the moving defendants departed from the standard of care in managing Decedent's labor, delivery, and postpartum complications. Specifically, Plaintiff alleges that Dr. Calluzzo failed to adequately assess Decedent's high-risk status, left the hospital on November 27 without adequate directives or inquiries to monitor her blood pressure, and failed to timely order and perform a c-section. Plaintiff alleges Dr. Brady, in his position as an anesthesiologist, failed to review and appreciate Decedent's high blood pressure during and after the epidural. Plaintiff alleges that Dr. Herzog failed to timely order blood transfusions and treat Decedent's post-operative hemorrhage. Plaintiff further alleges that all these departures proximately caused Decedent's delayed diagnosis and treatment for preeclampsia, HELLP syndrome, and coagulopathy, and ultimately led to her deterioration and death.
Plaintiff's claims against North Shore Ob/Gyn, P.C. and Women's Health Professionals, LLP arise from their vicarious liability for Dr. Calluzzo and Dr. Herzog.
Plaintiff's claims against Northwell Health, Inc. arise from their alleged vicarious liability for the physicians and staff at North Shore University Hospital, including thirteen other named defendants.
As an initial matter, Northwell Health, Inc. moves for summary judgment (Seq. No. 7) on the basis that they are not a proper party in this action and bear no vicarious liability for the acts and omissions of North Shore University Hospital or its employees.
The movants concede that Northwell Health, Inc. is a "parent corporation" of North Shore University Hospital, which is also named as a defendant in this action. They submit an affidavit from Avraham Z. Schwartz ("Schwartz"), a Vice President of Corporate Risk Management at Northwell Health, Inc. Schwartz avers that Northwell Health, Inc. does not and has never rendered any medical treatment or care, it is not licensed as a health care provider by the New York State Department of Health, it does not maintain insurance coverage for medical malpractice claims, and "the type and amount of professional liability insurance available is not affected" by whether they are a named party in this action.
In opposition, Plaintiff argues that Northwell Health, Inc., while not a direct health care provider, does bear vicarious liability for the acts and omissions of North Shore University Hospital as its parent corporation.
No appellate authority has yet ruled on the issue of whether vicarious liability for medical malpractice is imputed to a corporate entity such as Northwell Health, Inc., which is distinct from its subsidiary hospitals and health care facilities. However, generally, courts have recognized that "a parent corporation will not be held liable for the torts or obligations of a subsidiary unless it can be shown that the parent exercised complete dominion and control over [*4]the subsidiary" (Mitchell v TAM Equities, Inc., 27 AD3d 703, 708 [2d Dept 2006]; Potash v Port Auth. of New York and New Jersey, 279 AD2d 562, 562 [2d Dept 2001]).
All the cases cited by Plaintiff expressly and consistently hold that "a hospital may be held vicariously liable for the negligence or malpractice of its employees acting within the scope of employment" (Fuessel v Chin, 179 AD3d 899, 901 [2d Dept 2020], quoting Seiden v Sonstein, 127 AD3d 1158 [2d Dept 2015]), and a hospital may also be liable for non-employees "where a patient comes to the emergency room seeking treatment from the hospital and not from a particular physician of the patient's choosing" (id. at 901; see Mduba v Benedictine Hosp., 52 AD2d 450, 454 [3d Dept 1976]). These cases are not relevant to the issue of whether a hospital and the hospital's parent company are equally liable.
In another case cited by Plaintiff, the defendant was named as "North Shore University Hospital — Northwell Health" as a single defendant, and neither party acted to correct or separate the hospital from its parent corporation in the caption. However, the substance of the decision relates entirely to North Shore University Hospital as a hospital where the plaintiff received medical care, rather than imposing any liability on Northwell Health, Inc. as a separate party (Napolitano v Wighton, 235 AD3d 645, 647-648 [2d Dept 2025]). The defendants here have not contested that North Shore University Hospital is vicariously liable for its employees and agents. They seek to dismiss the claims against Northwell Health, Inc. as a separately named co-defendant, which does not provide health care services or maintain insurance coverage for malpractice.
Plaintiff argues that Northwell Health, Inc. and North Shore University Hospital appeared in this action by filing a joint answer and demands "without distinction between the two entities." However, the fact they are jointly represented does not impede their ability to set forth different defenses and motions for dismissal/summary judgment on different grounds.
It is undisputed by any party that Northwell Health, Inc. is not a hospital, nor are they licensed to provide any direct health care services which would trigger the vicarious liability case law cited by Plaintiff. The Court finds that their submissions, including the Schwartz affidavit, establish prima facie that they are a parent corporation which did not "exercise complete dominion and control" over North Shore University Hospital, and thus cannot be held liable for the torts of the subsidiary co-defendant. Plaintiff fails to raise any triable issues of fact on this issue. Accordingly, the summary judgment motion of Northwell Health, Inc. is granted, and Plaintiff's claims against Northwell Health, Inc. are dismissed as a matter of law.
Turning to the other summary judgment motions, in a medical malpractice action, the Court applies the burden shifting process as summarized by the Second Department: "[A] defendant must make a prima facie showing either that there was no departure from good and accepted medical practice, or that the plaintiff was not injured by any such departure" (Rosenzweig v Hadpawat, 229 AD3d 650, 652 [2d Dept 2024]). "In order to sustain this prima facie burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's complaint and bill of particulars" (Martinez v Orange Regional Med. Ctr., 203 AD3d 910, 912 [2d Dept 2022]). "Once a defendant physician has made such a showing, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact, but only as to the elements on which the defendant met the prima facie burden. Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions." (Rosenzweig at 652 [2d Dept 2024] [internal quotation marks and citations omitted].) However, "expert opinions that are conclusory, speculative, or unsupported by the record are [*5]insufficient to raise triable issues of fact" (Barnaman v Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023]).
In support of the Estate of Dr. Brady's motion (Seq. No. 8), the movant submits an expert affirmation from Richard Smiley, M.D. ("Dr. Smiley"), a licensed physician board certified in anesthesiology with a subspeciality in obstetric anesthesiology.
Dr. Smiley opines that all treatment provided by Dr. Brady was within the standard of care and he had a limited duty in his role as an anesthesiologist to monitor to patient for anesthesia side effects. He states that Dr. Brady "administered a standard, routine epidural" at the request of the attending ob/gyn Dr. Calluzzo, and the epidural itself was uneventful.
Following the epidural, the expert opines that it is the anesthesiologist's role to "monitor for any concerning symptoms related to the epidural," which specifically includes abnormally low blood pressure. Dr. Brady's assisting nurse followed up on checking and recording Decedent's blood pressure, which was not low but high. Because high blood pressure, headaches, and blurry vision — the symptoms experienced by Decedent — are not associated with any side effects or conditions related to anesthesia, the expert opines it was not Dr. Brady's role to intervene and that he properly relied on the ob/gyn team to make any decisions in how to respond to these symptoms, whether to order HELLP labs, when and how to deliver the baby, or when to administer appropriate medications.
On the issue of proximate causation, the expert reiterates that Dr. Brady's role was "limited to the field of anesthesia" and that no anesthesia-related treatment Decedent received proximately caused or exacerbated her severe preeclampsia, HELLP syndrome, or intracranial hemorrhage.
Based on evaluation of these submissions, the Court finds that Dr. Brady's expert established prima facie entitlement to summary judgment. The expert set forth sufficiently detailed opinions stating that no treatment Dr. Brady provided during or after the epidural caused or worsened her injuries or death, and that he complied with the standard of care by monitoring her only for symptoms related to anesthesia complications.
In opposition, Plaintiff submits an expert affirmation from [name of expert redacted], a licensed physician board certified in obstetrics and gynecology. "[W]here a physician opines outside his or her area of specialization, a foundation must be laid tending to support the reliability of the opinion rendered" (Hannen v Nici, 230 AD3d 1118, 1120 [2d Dept 2024], quoting Abruzzi v Maller, 221 AD3d 753, 756 [2d Dept 2023]). Here, the Court finds the Plaintiff's expert has laid a proper foundation to opine on the issues related to the claims against Dr. Brady. The expert sets forth that they have "worked closely with anesthesiologists in obstetric settings" for over 30 years, specifically in managing patients with hypertension and preeclampsia, and they are familiar with the standard of care applicable to anesthesiologists in the context of labor and delivery, as well as general duties of medical doctors.
The expert opines that Dr. Brady had an independent duty as anesthesiologist to monitor Decedent's blood pressure following the epidural and advise Dr. Calluzzo of her abnormal blood pressure readings. Contrary to the movant's expert opinion that only low blood pressure results would be concerning to an anesthesiologist and require intervention, Plaintiff's expert opines that the anesthesiologist should have been monitoring for any abnormal vital signs and blood pressure over the course of the night. The expert opines that because Dr. Brady would be providing anesthesia for labor and delivery, he should have independently informed Dr. Calluzzo or directed the residents to monitor Decedent for signs of hypertension and preeclampsia, which [*6]"would affect the residents' plan to augment labor for a vaginal delivery." The expert opines that an epidural would normally "reduce blood pressure initially, not elevate it," so the fact Decedent was hypertensive after the epidural was initiated should have been concerning, and the standard of care required Dr. Brady to inform her attending physician.
Plaintiff's expert also opines that "in the absence" of Dr. Calluzzo, who did not arrive at the hospital until 5:30 a.m., good medical practice required Dr. Brady to manage Decedent's increasingly severe hypertension himself and order or administer the necessary medication.
Plaintiff's expert also counters the movant on the issue of proximate causation. While the expert does not dispute that the epidural or anesthesia itself did not worsen Decedent's condition, they opine that Dr. Brady's alleged failure to properly monitor Decedent's blood pressure, inform the ob/gyn team of Decedent's hypertensive readings, and administer blood pressure lowering medication contributed to the critical delay in timely diagnosis and treatment.
The Court finds Plaintiff's expert has raised issues of fact as to Dr. Brady's independent obligations and the standard of care. It is well established that "although physicians owe a general duty of care to their patients, that duty may be limited to those medical functions undertaken by the physician and relied upon by the patient" (Romanelli v Jones, 179 AD3d 851, 852-853 [2d Dept 2020] [internal citations omitted]). However, here both experts agree that Dr. Brady's duty as an anesthesiologist included monitoring Decedent's blood pressure following the epidural. Plaintiff's expert raises an issue of fact as to whether Dr. Brady departed from good and accepted medical practice in monitoring and responding to Decedent's abnormal and rising blood pressure. Plaintiff's expert also raises an issue of fact as to whether these departures proximately caused the worsening of her condition and ultimately her death.
"When experts offer conflicting opinions, a credibility question is presented requiring a jury's resolution" (Stewart v. North Shore Univ. Hosp. at Syosset, 204 AD3d 858, 860 [2d Dept. 2022] citing Russell v. Garafalo, 189 AD3d 1100, 1102 [2d Dept. 2020]). The parties' experts have established issues of fact which preclude summary judgment on behalf of Dr. Brady as a matter of law, and therefore the Estate of Dr. Brady's motion (Seq. No. 8) is denied.
Turning to the motion of Dr. Calluzzo, Dr. Herzog, North Shore Ob/Gyn, P.C., and Women's Health Professionals, LLP (Seq. No. 9), the movants submit an expert affirmation from Michael Cabbad, M.D. ("Dr. Cabbad"), a licensed physician board certified in obstetrics and gynecology and maternal fetal medicine.
With respect to Dr. Calluzzo, the expert opines that all prenatal treatment rendered to Decedent — including her last visit to Dr. Calluzzo on November 24, 2015 — was largely uneventful and the movant complied with the standard of care. The expert opines that although Decedent had slightly elevated blood pressure of 130/80 on her final two visits (including November 24), this did not meet the criteria for preeclampsia and no prophylactic measures were required.
Dr. Cabbad opines that based on Decedent's presentation on November 27, when she was readmitted to North Shore University Hospital at approximately 4:20 p.m., she was "an appropriate candidate for induction" as directed by Dr. Calluzzo, as she had premature rupture of membranes and was not in active labor. The expert opines that Dr. Calluzzo appropriately evaluated the patient at 6:20 p.m., initiated a plan of care, and left the hospital with the reasonable assumption that Decedent was "in the earliest stages of labor" and "residents would immediately contact her if there were any issues overnight."
It is Dr. Calluzzo's contention that she was never contacted about Decedent's labor [*7]progression, elevated blood pressure, or any complications until 4:55 a.m. She testified that she had one conversation with a resident around 2:44 a.m. with a "general update" and the request for an epidural, which she ordered. The expert states that Dr. Calluzzo was "first made aware" of Decedent's hypertensive episodes at 4:55 a.m., after a resident had already ordered and drawn blood for HELLP labs, and that Dr. Calluzzo promptly went to the hospital.
The expert opines that it was within the standard of care for Dr. Calluzzo to attempt to stabilize Decedent's blood pressure before attempting a c-section, "as not doing so would have posed a risk of serious injury or even death." The expert opines that she appropriately ordered blood pressure lowering medication at 15-minute intervals, attempted vaginal delivery, and ultimately took the patient to the operating room for an emergency c-section due to fetal heart rate decelerations. The expert opines that Dr. Calluzzo properly performed the c-section, and although there was "slightly greater" blood loss than expected, this was "properly repaired and stabilized intraoperatively" and Decedent was "transferred to the recovery room in stable condition." The expert opines that Dr. Calluzzo then appropriately informed her colleague Dr. Herzog of the preceding events and transferred Decedent's care to him.
The movants' expert opines that when Dr. Herzog officially took over as attending ob/gyn at 8:00 a.m., the patient had been transferred to the Post-Anesthesia Care Unit "which is standard practice following labor and delivery." The expert acknowledges that there are "inconsistent accounts of the chronology of events during this period" in the record, but states that Dr. Herzog was first contacted by a resident around 9:33 a.m. and informed Decedent was experiencing hypotensive episodes (a decrease in blood pressure), bleeding, and low urine output. The expert opines that Dr. Herzog complied with the standard of care when he arrived at 10:00 a.m. by ordering blood transfusions, a SICU consult, and hematology consult. The expert opines that a neurosurgery consult was not indicated at that time, because Decedent did not show any neurological symptoms until approximately 1:36 p.m.
The expert further opines that after the patient was diagnosed with DIC, her care was taken over by the SICU and Maternal Fetal Medicine attending physicians, although Dr. Herzog continued to see the patient and consult on her status.
On proximate causation, the expert opines that in light of the progression of her preeclampsia, there was no significant delay in treatment caused by Dr. Calluzzo's attempt to lower Decedent's blood pressure and continue vaginal delivery when she arrived around 5:30 a.m., and "performing a c-section immediately upon her arrival that morning would not have altered the outcome." The expert also opines that none of Dr. Herzog's actions proximately caused Decedent's injuries or death, and he could not have prevented her brain hemorrhage or eventual death.
Based on evaluation of these submissions, the movants' expert fails to eliminate issues of fact necessary to establish prima facie entitlement to summary judgment on behalf of Dr. Calluzzo. Of note, the expert relies on the assumption that Dr. Calluzzo was never informed of any elevated blood pressure readings or signs of preeclampsia or HELLP syndrome from the time she left the hospital around 7:00 p.m. until the phone call at 4:55 a.m. However, as Plaintiff notes in opposition, there is some dispute in the record as to what Dr. Calluzzo was told when consulted by a resident around 2:44 a.m. about the epidural, as the resident testified that their usual practice would be to inform the attending physician of abnormal blood pressure.
Further, the expert fails to address any of Plaintiff's claims of inadequate direction of the residents and failure to closely monitor Decedent for hypertension. The expert only states that [*8]Dr. Calluzzo left for the night "with the understanding" that she would be informed if there were "any issues." Regardless of any claims of independent negligence against the hospital residents or staff in this action, the expert does not address the period of several hours in which Dr. Calluzzo, as the private "attending physician" managing Decedent's care even when she was not present at the hospital, did not directly inquire on the patient's blood pressure and/or direct the residents to monitor said blood pressure.
With respect to Dr. Herzog, the movants' expert acknowledges there are "inconsistent accounts" and disputes in the record as to the timeline of Decedent's treatment following the c-section and Dr. Herzog's role as an attending or consulting physician. There are further discrepancies between the expert's affirmation and the record as to when Dr. Herzog ordered blood transfusions and when those units were administered. As such, the movants' expert has not met their prima facie burden and eliminated issues of fact as to Dr. Herzog's liability.
On the issue of proximate causation, the expert's statement is brief and conclusory, and only relates to the alleged one-hour delay in performing the c-section after Dr. Calluzzo's arrival in the early morning of November 27, not any other alleged delay in diagnosis or treatment. Additionally, the expert's opinions as to proximate causation as to Dr. Herzog are conclusory and not supported by the record.
For these reasons, the movants have not established prima facie entitlement to summary judgment in favor of Dr. Calluzzo and Dr. Herzog.
Notwithstanding the above, in opposition to the motion, Plaintiff submits an expert affirmation from [name of expert redacted], a licensed physician board certified in obstetrics and gynecology.
Plaintiff's expert opines that Dr. Calluzzo departed from the standard of care in multiple ways, including by failing to admit Decedent to the hospital for induced labor or c-section as early as November 24 in light of her risk factors (advanced maternal age, past due date, elevated systolic blood pressure). On the evening of November 27, Plaintiff's expert opines that Dr. Calluzzo failed to appreciate Decedent's risk for preeclampsia and other complications in light of her age, premature rupture of membranes, and elevated blood pressure from her last two prenatal visits. The expert opines that Dr. Calluzzo implemented an inadequate plan of care to induce labor with Cytotec, then left the hospital "for over ten hours," returning at approximately 5:30 a.m., by which time Decedent was experiencing severe symptoms of preeclampsia and HELLP syndrome.
During the period while Dr. Calluzzo was absent from the hospital, the expert notes that she was still the "on-call attending physician" responsible for advising and directing the hospital residents. The expert also notes that Decedent was hypertensive at 7:23 p.m., but her blood pressure was not checked again until 11:43 p.m., at which point her systolic blood pressure was severely hypertensive, spiking as high as 179/81. It was also not checked between the hours of 12:03 a.m. and 2:55 a.m. The expert notes that it is not clear from the record whether Dr. Calluzzo was told about Decedent's episodes of elevated blood pressure. However, even if Dr. Calluzzo was not "informed," as she testified, the expert opines that in light of Decedent's risk factors and recent history, the standard of care required Dr. Calluzzo to proactively order blood pressure checks every hour, escalating to "every 15 minutes if elevated levels were observed," follow up with the residents directly on Decedent's hypertension, and test for HELLP syndrome sooner.
The expert further opines that even when Dr. Calluzzo returned at 5:30 a.m., she deviated [*9]from the standard of care by not immediately performing a c-section and instead attempting vaginal delivery. Though Dr. Calluzzo stated that Decedent's blood pressure needed to be lowered before a c-section could be attempted, the expert opines that in this case, an immediate c-section was "necessary to save the life of the mother, even without being able to first stabilize the blood pressure." The expert also opines it was a deviation from the standard of care to attempt vaginal delivery and instruct decedent to push, as she was experiencing neurological symptoms (headache and blurred vision) and pushing would only increase her intracranial pressure.
Finally, the expert opines that Dr. Calluzzo departed from the standard of care by leaving the hospital before the arrival of Dr. Herzog while Decedent "had severe preeclampsia, had suffered a hypertensive emergency prior to delivery with systolic blood pressures of 186 and 206, had suffered hemorrhage during her c-section and had labs drawn at 4:33 a.m. that were trending toward HELLP syndrome." The expert opines that Dr. Calluzzo should have ordered repeat blood work and HELLP labs as of 8:00 a.m. to continue evaluating the progression of her HELLP syndrome, coagulopathy, and DIC.
Turning to Dr. Herzog, Plaintiff's expert opines that he was responsible for Decedent's care from the time he took over as attending physician at 8:00 a.m. until her transfer to the SICU around 1:00 p.m., though he only arrived at the hospital at approximately 10:00 a.m. The expert notes that throughout this period, Decedent had "hallmarks of worsening DIC" including profound anemia and low platelets, and yet she received her first blood transfusion of "one unit" at 12:55 p.m. shortly before she was transferred to critical care. The expert opines that despite Dr. Herzog requesting a hematology consult, two units of plasma, and two units of packed red blood cells around 11:00-11:30 a.m., he failed to order the appropriate transfusions "stat or immediately" and ensure they were actually administered. The expert opines that Dr. Herzog departed from the good and accepted medical standards by failing to promptly arrive at the hospital upon assuming responsibility for Decedent's care and failing to timely order follow-up HELLP labs, hematology consult, and blood transfusions.
On the issue of proximate causation, the expert opines that all these departures led to the worsening of Decedent's condition and ultimate demise. The expert opines that her complications and death could have been avoided with earlier induction of labor or c-section, and that Dr. Calluzzo's deviations from the standard of care led to a prolonged period of untreated hypertension, preeclampsia, and HELLP syndrome. The expert opines in particular that the five-hour gap between 2:00 a.m. and the completion of the c-section at 7:05 a.m. was critical, as Decedent's condition "catastrophically worsened" during that time and this could have been prevented if Dr. Calluzzo had returned, ordered HELLP labs, and performed the c-section earlier. The expert opines that the amount of bleeding and hemorrhage suffered by Decedent was a direct result of the progression of coagulopathy and DIC, which would have been avoided if she was timely diagnosed and delivered earlier. The expert also opines that the "inadequate post-operative management" of Dr. Herzog was a substantial contributing factor in her eventual brain hemorrhage and death.
Thus, even if the movants' expert had met their prima facie burden, Plaintiff's expert has raised multiple issues of fact as to the standard of care and proximate causation, sufficient to defeat the motion for summary judgment on behalf of Dr. Calluzzo and Dr. Herzog. For this reason, the branches of the motion (Seq. No. 9) seeking summary judgment in favor of Dr. Calluzzo, Dr. Herzog, and the vicarious liability claims of North Shore Ob/Gyn, P.C. and [*10]Women's Health Professionals on behalf of Dr. Calluzzo and Dr. Herzog, are denied.
Accordingly, it is hereby:
ORDERED that Northwell Health, Inc.'s motion (Seq. No. 7) for an Order, pursuant to CPLR 3212, granting summary judgment in favor of Northwell Health, Inc. and dismissing Plaintiff's complaint against them, is GRANTED; and it is further
ORDERED that the Estate of Dr. Brady's motion (Seq. No. 8) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing all claims and causes of action against them, is DENIED; and it is further
ORDERED that North Shore Ob/Gyn, P.C., Women's Health Professionals, LLP, Dr. Calluzzo, Dr. Herzog, Dr. Greenberg, and Dr. Rothstein's motion (Seq. No. 9) seeking summary judgment in their favor is GRANTED TO THE EXTENT of dismissing all claims against Dr. Greenberg and Dr. Rothstein without opposition, and dismissing any vicarious liability claims against North Shore Ob/Gyn, P.C. and Women's Health Professionals, LLP for the acts of Dr. Greenberg and Dr. Rothstein only, and the motion is DENIED with respect to Dr. Calluzzo, Dr. Herzog, and the vicarious liability claims against North Shore Ob/Gyn, P.C. and Women's Health Professionals, LLP for the acts of Dr. Calluzzo and Dr. Herzog; and it is further
ORDERED that the caption is amended to read:
DENNIS COSGROVE, EXECUTOR OF THE ESTATE
OF MEGAN COSGROVE, DECEASED,
Plaintiff, 
against
NORTH SHORE UNIVERSITY HOSPITAL, NORTH
SHORE OB-GYN, P.C., WOMENS HEALTH
PROFESSIONALS, LLP, ILIA CALLUZZO, M.D.,
RICHARD HERZOG, M.D., OMAR BHOLAT, M.D.,
CHAD EDWARD WATSON, EXECUTOR OF THE
ESTATE OF KATARZYNA SUFFECOOL, M.D.,
AHMAD LATEFI, M.D., JACOB JANUSZEWSKI,
M.D., SHAMIK CHAKRABORTY, M.D., JUDITH A.
BRADY, EXECUTOR OF THE ESTATE OF JOHN
BRADY M.D., JENNY TAM, M.D., AMANDEEP
SINGH, M.D., ANAR YUKHAYEV, M.D.,
FRANCES F. HSIEH, M.D., DENISE MOSES,
M.D., GRACE CHOW, M.D., LAUREN OSTRY,
M.D., and CHRISTINE WIEST, P.A.,
Defendants.
The Clerk shall enter judgment in favor of NORTHWELL HEALTH, INC. f/k/a NORTH SHORE-LONG ISLAND JEWISH HEALTH SYSTEM, INC., GILAD GREENBERG, M.D., and RANDI ROTHSTEIN, M.D.
This constitutes the decision and order of the Court.
ENTER.
Hon. Consuelo Mallafre Melendez
J.S.C.

Footnotes

Footnote 1:North Shore Ob/Gyn, P.C. is a professional corporation associated with defendants Dr. Calluzzo, Dr. Herzog, Dr. Greenberg, and Dr. Rothstein. It is not part of Northwell Health, Inc. or North Shore University Hospital, except that its private physicians had admitting privileges there.